**ALLEGHANY CORPORATION,**
Plaintiff,

v.

**Allan P. KIRBY, Randolph Phillips, Charles T. Ireland, Jr., and Fred M. Kirby, Defendants.**

United States District Court
S. D. New York.
May 28, 1963.

Townley, Updike, Carter & Rodgers, New York City, for plaintiff, Stuart N. Updike, J. Howard Carter, Lee W. Meyer, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for defendants Allan P. Kirby and Fred M. Kirby, Granville Whittlesey, Jr., Roy W. McDonald, Rob-

ert M. Loeffler, Walter L. Stratton, Robert V. Dunn, John J. McCann, New York City, of counsel.

Randolph Phillips, defendant pro se.

Kissam & Halpin, New York City, for Charles T. Ireland, Jr., Leo T. Kissam, Anthony J. Genovese, Edmund K. Leach, New York City, of counsel.

DAWSON, District Judge.

### The Nature of the Action

This action represents another chapter in the checkered career of Alleghany Corporation. Although brought as a suit in equity, it appears to be but another skirmish in the battle of tycoons (the Murchison Brothers of Texas on one side, and Allan P. Kirby of New Jersey on the other) for control of a rich plum—Alleghany Corporation. With the advantage of greath wealth on both sides, and the logistical support of battalions of lawyers and squads of publicity men, the parties have ranged around the country using to the full the broad discovery processes of the Federal Rules. Over 20,000 pages of pre-trial depositions were taken. Now the action has been tried.

The action was originally commenced on September 8, 1960 as a derivative stockholders' action brought by John D. Murchison and Clint W. Murchison, Jr. and Gerard S. Fossland, as stockholders of Alleghany Corporation, against Allan P. Kirby, Randolph Phillips, Fred M. Kirby, Charles T. Ireland, Jr. and five other defendants. The suit was brought as one on behalf of Alleghany Corporation, which was named as a nominal defendant. It contained two causes of action.

It is interesting that the action was started almost coincidentally with the institution of a proxy fight by the Messrs. Murchison against Mr. Kirby for control of Alleghany Corporation, and the filing of the suit was hailed with a great flurry of publicity apparently intended to affect the voting in the proxy contest for control of the corporation. The proxy fight was successful and the Murchisons apparently came into control of Alleghany

Corporation. As a result the complaint was amended on June 27, 1962 to substitute Alleghany Corporation as party plaintiff in place of the original plaintiffs and the action dismissed as to all defendants other than Allan P. Kirby, Randolph Phillips, Fred M. Kirby and Charles T. Ireland, Jr.

A number of pre-trial conferences were held to try to define the issues in the action. On December 18, 1962, with the approval of the Court, an amended and supplemental complaint was filed. This complaint dropped the allegations of the second count of the original complaint. It continued the first count of the original complaint which alleged in substance that Allan P. Kirby, Ireland and Phillips had committed a fraud upon this Court in obtaining this Court's order of December 24, 1959 vacating as to Kirby this Court's prior injunctive order of October 27, 1955 entered in the action of Breswick v. Briggs, D.C., 135 F.Supp. 397, hereinafter described. The amended and supplemental complaint also contained allegations charging that Kirby had committed a fraud upon the New York State Supreme Court by failing to adduce before that court, in connection with hearings held therein in the action of Zenn v. Anzalone, facts as to Kirby's liability on claims asserted therein based upon the so-called 1950 Exchange Transaction between Alleghany Corporation and Kirby and certain other officers of that corporation (hereinafter described).

The amended and supplemental complaint seeks the following relief:

1. That the Court declare null and void a certain stipulation of settlement, dated December 24, 1959, in Zenn v. Anzalone, and declare null and void so much of its order of December 24, 1959 vacating its injunctive order of October 27, 1955 and approving the separate Kirby settlement in Breswick v. Briggs, or, in the alternative, enter an order enjoining Kirby from pleading such order or judgment as *res judicata* or collateral estoppel.

2. That the Court declare null and void so much of the order approving the

separate Kirby settlement which was entered by the New York Supreme Court in Zenn v. Anzalone, 17 Misc.2d 897, 191 N.Y.S.2d 840; or, in the alternative, enter an order enjoining Kirby from pleading any such order or judgment as *res judicata* or collateral estoppel.

3. That the Court declare null and void so much of the judgments of the New York Supreme Court entered on February 4, 1960 and June 21, 1960 as dismissed the complaint in Zenn v. Anzalone on the merits with respect to Kirby; or, in the alternative, enter an order enjoining Kirby from pleading any such judgments as *res judicata* or collateral estoppel.

4. That the Court declare null and void, and rescind any and all releases on behalf of Alleghany delivered to Kirby in either the Breswick or Zenn actions.

5. That in the event the Court grants the relief hereinbefore sought, the Court rescind the 1950 Exchange Transaction hereinafter described, or award against Kirby and in favor of Alleghany Corporation damages measured by the value of a rescission of the said Exchange Transaction; or, in the alternative, order the filing of an amended complaint in this action based upon the 1950 Exchange Transaction and direct a prompt trial thereof.

6. That the Court direct Kirby, Phillips and Ireland to account to Alleghany for all moneys, profits and benefits received by them as a result of the secret agreement and conspiracy alleged in the complaint.

7. That the Court direct Kirby, Ireland and Fred M. Kirby to reimburse Alleghany for legal fees and expenses incurred by it in actively defending this action from September 8, 1960 to June 14, 1961, and with respect to attorneys' fees incurred on its behalf prior to the filing of the amended and supplemental complaint.

8. That the Court award to Alleghany Corporation the costs and disbursements of the action.

Further pre-trial conferences were held. Plaintiff was directed to submit a proposed statement of the issues. The first issue submitted in the proposed Statement of Issues states substantially the principal contentions of the plaintiff. This section of the statement reads as follows:

"1. Did Kirby procure by fraud an order of this Court dated December 24, 1959, vacating insofar as Kirby was concerned, an order of this Court dated October 27, 1955; an order of the New York County Supreme Court dated December 28, 1959; a judgment of the New York County Supreme Court dated February 4, 1960; and releases from plaintiff subsequent thereto by means of:

"(a) A corrupt agreement with Ireland and Phillips whereby Kirby was enabled to settle his liabilities to Alleghany Corporation which had been asserted in derivative actions in this Court and the New York County Supreme Court for an amount far less than he would have had to pay but for such agreement, and Phillips and Ireland personally benefited from such agreement; or,

"(b) A failure by Kirby to adduce or cause to be adduced before the State Court or its Referee or this Court or its Special Master in the Zenn (State) and Breswick litigations facts material to an evaluation of Kirby's liability on claims arising out of the 1950 Exchange Transaction and the fairness and adequacy of Kirby's proposed settlement in connection therewith?"

Statement 4 of the Statement of Issues sets out plaintiff's contentions with reference to the relief sought. This statement reads as follows:

"4. May this Court grant relief from such a fraud:

"(a) By setting aside the judgment of the New York County Supreme Court entered in Zenn v. Anzalone with respect to Kirby and the

releases obtained by Kirby in connection therewith; or,

"(b) By enjoining Kirby from pleading such judgments and releases in bar of a separate trial in this action on the merits of the 1950 Exchange Transaction; or,

"(c) By granting money damages to the corporation measured by the difference between the amount Kirby paid in settlement and the fair settlement value of the claim against Mr. Kirby in the absence of his fraud?"

A trial was held commencing on April 1, 1963, and continuing until April 19, 1963. Two thousand four hundred seventy-four pages of testimony were taken. Two hundred twenty-two exhibits were introduced. A full opportunity has been given to the parties to explore thoroughly by discovery all the facts necessary for a determination of the issues and a full and complete trial was had thereon. The Court now renders its opinion, findings of fact and conclusions of law as follows:

### The Jurisdiction of the Court

The action is one, essentially, to set aside as to Kirby a settlement of a previous derivative stockholders' suit which had been brought against Kirby and others in a New York State Court on the basis that the settlement of Kirby's liability to Alleghany Corporation had been accomplished by fraud in that (1) Kirby had made a secret, corrupt agreement with a person in a controlling position in the stockholders' litigation to give that person a benefit, kept secret from the Court, if the derivative litigation were settled favorably to Kirby, and (2) that Kirby had failed to adduce before the State Court and its Referee facts known to him which were necessary to any evaluation of his liability in the derivative stockholders' litigation.

It is interesting that although the Murchisons, who were also defendants in the derivative stockholders' litigation in the New York Court, succeeded in securing a settlement of their liability, no attempt has been made to upset the settlement insofar as it relates to them.

Defendants urge that this Court does not have jurisdiction of this action. They urge, in the first place, that this Court does not have jurisdiction to vacate orders and judgment of the New York State Court approving settlement of the derivative stockholders' litigation. This argument is unsound. This is an independent action. This action does not seek to reverse the decision of the State Court but rather to prevent the defendant Kirby from claiming the benefits of a judgment of that Court which plaintiff alleges was obtained by fraud. If there is diversity of citizenship such independent action may lie and may be maintained in this Court.

The United States Supreme Court in Marshall v. Holmes, 141 U.S. 589, 12 S. Ct. 62, 35 L.Ed. 870 (1891), pointed out, as to the jurisdiction of the Federal Court in such an action:

" * * * While it cannot require the state court itself to set aside or vacate the judgments in question, it may, as between the parties before it, if the facts justify such relief, adjudge that Mayer shall not enjoy the inequitable advantage obtained by his judgments. A decree to that effect would operate directly upon him, and would not contravene that provision of the statute prohibiting a court of the United States from granting a writ of injunction to stay proceedings in a state court. It would simply take from him the benefit of judgments obtained by fraud." 141 U.S. at p. 599, 12 S.Ct. at p. 65, 35 L.Ed. 870.

See also, Hewitt v. Hewitt, 17 F.2d 716 (9th Cir., 1927); Arrowsmith v. Gleason, 129 U.S. 86, 101, 9 S.Ct. 237, 32 L.Ed. 630 (1889); Hadden v. Rumsey Products, 196 F.2d 92 (2d Cir., 1952); Griffith v. Bank of New York, 147 F.2d 899, 160 A.L.R. 1340 (2d Cir., 1945), cert. denied, 325 U.S. 874, 65 S.Ct. 1414, 89 L. Ed. 1992 (1945).

■ ■ The defendants urge in the second place that there is no diversity of citizenship in this case. At the time of the institution of the action there was undoubtedly diversity of citizenship. The plaintiffs were all residents of states other than those of the defendants. As has been said, the action was brought as a derivative stockholders' action on behalf of Alleghany Corporation. When the Murchisons acquired control of Alleghany Corporation, Alleghany Corporation was substituted as plaintiff in the action, being the party on whose behalf the action was brought. Defendants urge that Alleghany has a principal place of business in New York and that the defendants Phillips and Ireland are residents of New York and that this, therefore, divested any diversity of citizenship. This is not correct. Once jurisdiction has been acquired a subsequent change of parties does not remove such jurisdiction. In Mullen v. Torrance, 9 Wheat. 537, 22 U.S. 537, 6 L.Ed. 154 (1824), Chief Justice Marshall said:

"It is quite clear, that the jurisdiction of the court depends upon the state of things at the time of the action brought, and that after vesting, it cannot be ousted by subsequent events. * * *"

Thus the rationale that jurisdiction is decided by facts existing at the time the action is brought is applied in a situation where a party dies and a non-diverse representative is substituted. Dunn v. Clarke, 8 Pet. 1, 8 L.Ed. 845 (1834). See Smith v. Sperling, 354 U.S. 91, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957). Also, in an action of ejectment where the jurisdiction of the court had attached against the tenant in possession the substitution of the landlord for such tenant will not defeat the jurisdiction of the court. Hardenbergh v. Ray, 151 U.S. 112, 113, 14 S.Ct. 305, 38 L.Ed. 93 (1893).

The Court concludes that this Court has jurisdiction of the action.

### The Background of This Litigation

It is impossible to understand the nature of this suit without going into the prior legal proceedings which resulted in this action.

In the Spring of 1954 eight derivative stockholders' actions were brought in the Supreme Court, New York County, on behalf of Alleghany Corporation against various of its officers and directors, including Allan P. Kirby, Robert R. Young, Clint W. Murchison, Jr., John D. Murchison and others. In June, 1954, these eight actions were consolidated into one action under the title of Zenn v. Anzalone. The firm of Pomerantz, Levy & Haudek was designated as plaintiffs' general counsel. Two later actions were consolidated into this action in May, 1955. A consolidated amended complaint was later filed. It alleged eight causes of action. The first cause of action was based on the so-called 1950 IDS Exchange Transaction. This 1950 Exchange Transaction, so far as Kirby was concerned, consisted of the transfer by Kirby on May 15, 1950 to Alleghany of 2,420 shares of Alleghany Preferred Stock Series A for 24,062 Class A shares of Investor's Diversified Services, Inc. (hereinafter IDS). This exchange had been authorized pursuant to a resolution of the Board of Directors of Alleghany fixing the cost at the market price of Alleghany stock and at the market price, or cost of Alleghany, whichever was higher, of the IDS Class A stock. This resolution of the Board of Directors of Alleghany was subsequently approved and adopted by the stockholders of Alleghany Corporation at its annual meeting of May 15, 1950. This transaction was attacked on the ground that the proxy statement for the stockholders' meeting contained false and misleading statements and on the ground that the defendants, including Kirby, had knowledge concerning earning developments of IDS and an increase in market value both foreseeable and foreseen which was not known to the stockholders of IDS and Alleghany.

The other causes of action alleged in the consolidated amended complaint in the Zenn action arose from the following transactions, among others: the arrangements between Alleghany and defendants

Murchison and Richardson for the purchase by Murchison and Richardson of 800,000 shares of New York Central stock from the C & O; an agreement in December 1954 pursuant to which Alleghany transferred to Murchison Brothers 130,000 common voting shares of IDS in exchange for 130,000 shares of non-voting Class A shares of IDS; and the offer by Alleghany to exchange new convertible preferred stock for outstanding 5½% Series A preferred stock.

Allan P. Kirby was never served in the Zenn actions in the State Court.

On or about May 20, 1954, similar actions were instituted in this Court by the plaintiffs in the Zenn actions. These actions have been denominated as Zenn (Federal) and the other actions have been denominated as Zenn (State). The actions pending in this Court have never been tried and never formally dismissed or disposed of.

On February 14, 1955 an action entitled Breswick v. Briggs was commenced in this Court. The amended complaint later filed in that action contained some but not all of the claims alleged in the consolidated amended complaint in Zenn. It also was a derivative action brought on behalf of Alleghany Corporation. The Breswick complaint, however, did not include the so-called 1950 IDS Exchange Transaction. The attorney for the plaintiffs in the Breswick action was George Brussel, Jr. Defendant Randolph Phillips was retained as a consultant to Brussel.

In April 1955, as a result of negotiations between Pomerantz, as general counsel to plaintiffs in the Zenn action, and representatives of the defendants, a tentative settlement of all claims asserted in any pending derivative action involving Alleghany was agreed upon. The consideration was $700,000 cash to be paid by the defendants to Alleghany Corporation, plus the revision in favor of Alleghany of certain loss guarantees issued by the Murchisons to Alleghany in connection with certain joint ventures. The terms of the settlement were reduced to writing in a stipulation of settlement entered into between the plaintiffs and the defendants in the Zenn action dated July 25, 1955. In that same month Alleghany moved in the New York State Supreme Court for approval of the proposed settlement. On August 18, 1955 the Supreme Court appointed Robert J. Fitzsimmons as Referee and directed him to "inquire on the merits of the fairness, reasonableness and adequacy of a stipulation of settlement dated July 25, 1955 and to report as to whether such proposed settlement should be approved and confirmed." Notice of the terms of the proposed settlement was mailed to all stockholders of record of Alleghany advising them of the proposed settlement and notifying them of their right to attend a hearing thereon. Hearings on the proposed settlement commenced on September 19, 1955. Samuel R. Rosen, a stockholder of Alleghany, represented by the law firm of Graubard & Moskovitz, intervened and appeared at the hearings as an objectant to the proposed settlement. Phillips was also a consultant to Graubard of that firm and worked with Graubard and Rosen in objecting to the proposed settlement.

From September 19, 1955 until January 1956, Mr. Fitzsimmons, as Referee, conducted extensive hearings with respect to the merits of the claims alleged in the Zenn action and the adequacy and fairness of the proposed settlement. Numerous stockholders of Alleghany appeared in person or by counsel during the course of the hearings. Eighteen witnesses were called—seven by the proponents of the settlement and eleven by the objectants. Some four hundred and eighty exhibits were marked in evidence and some forty-six hundred pages of testimony were taken. The Referee rendered a report on November 17, 1958.

In the hearings before the Referee Mr. Kirby did not appear. He was excused from appearing by the Referee. Mr. Graubard, as counsel for objectant Rosen, both before the Referee and again in his brief before the Supreme Court in opposition to approval of the Referee's report, urged that the settlement should not

be approved and confirmed without the testimony of Kirby. This contention was overruled by the Referee.

The attorneys in the Breswick action asserted that their exclusion from the settlement negotiations in the Zenn action had been improper and unfair. They therefore brought a proceeding in this Court to enjoin the defendants therein from interposing in the Breswick action "any defense based upon any judgment entered in any action other than this action pursuant to any agreement not negotiated with the [Breswick] plaintiffs or their attorneys."

This Court, on October 27, 1955, granted such an injunction to the Breswick plaintiffs. At the conclusion of the hearings before the Referee in Zenn, the defendants in the Breswick action moved in this Court in March 1956 to vacate the injunctive provisions of the October 27, 1955 order in Breswick. Following the argument of the motion, Judge Walsh of this Court suggested that settlement of the entire litigation be discussed between the defendants and the Breswick plaintiffs. As a result, conferences were held between the parties.

During the course of these discussions defendants offered to increase the cash payment portion of the settlement from $700,000 to $1,000,000 and the Murchisons offered to return control of IDS to Alleghany by reversing the 1954–55 Exchange Transaction and transferring 130,000 voting shares of IDS to Alleghany in return for 130,000 non-voting shares of IDS. The proposed settlement, as augmented by this additional offer by the defendants, became known as the "Basic Settlement."

This Basic Settlement was, however, rejected by Mr. Brussel, representing the plaintiffs in the Breswick action. Nevertheless, the defendants in the Breswick action renewed their motion to vacate this Court's injunctive order of October 27, 1955 on the ground that they had conducted settlement negotiations with the Breswick plaintiffs in good faith and that these negotiations had resulted in offers in excess of the offer accepted by general counsel for the plaintiffs in Zenn.

This Court, by order of October 3, 1956, appointed Robert J. Fitzsimmons (who was then serving as Referee in Zenn) as Special Master in the Breswick action to hear and report to the Court whether the order of October 27, 1955 "should be vacated or modified by reason of any and all matters which may have taken place since October 27, 1955, including, without limitation however, the details of the aforesaid settlement negotiations between [the Breswick] plaintiffs and defendant." Mr. Fitzsimmons, as Special Master, then conducted hearings pursuant to this order.

On November 17, 1958 Mr. Fitzsimmons submitted his report to this Court in the Breswick litigation recommending that the injunctive order of October 27, 1955 be vacated. He had, on the same day, submitted the report to the Supreme Court in the Zenn litigation recommending that the original stipulation of settlement dated July 25, 1955, as augmented by the additional settlement (i.e., the Basic Settlement) be accorded judicial approval by that Court. He said:

"To summarize, the settlement whose fairness must be determined by this Court consists of the settlement originally submitted to this Court, as increased by the most recent augmented offer of defendants. By the terms of this amended settlement proposal, defendants are to pay the sum of $1,000,000 in cash to Alleghany; the 130,000 IDS share transaction is to be reversed; and the loss guarantee running from Murchison Brothers to Alleghany is to be amended so as to apply separately rather than in the aggregate to each of the joint ventures between Murchison Brothers and Alleghany.

"Apart from the payment of the sum of $1,000,000 in cash, it is not altogether easy to ascribe a precise valuation in dollars and cents to the other elements of the proposed settlement. It is significant, however, that counsel for objectant Rosen, on

the hearings before me, evaluated the rescission of the 130,000 IDS share transaction at more than $5,000,000; counsel for the Breswick plaintiffs in the Federal Court action has conceded that such rescission is worth more than $1,750,000. I further find that the amendment of the loss guarantee running from Murchison Brothers to Alleghany has a value to Alleghany of at least $300,000.

"I have considered the augmented offer of settlement in the light of the current probability of success or failure of the various causes of action alleged herein. So evaluated it appears to me that the amended offer of settlement constitutes a fair, reasonable and adequate basis for a settlement of this litigation and is worthy of judicial approval. In my considered judgment, it would be for the best interests of Alleghany and its stockholders to have this substantial settlement judicially approved so as to bring an end to this protracted litigation with its attendant expenses and its constant demands on the time of Alleghany's officers, who for many months have been prevented by this litigation from devoting all of their time and efforts to the business and affairs of the corporation.

"Accordingly, I respectfully report and recommend that the original stipulation of settlement herein, as augmented by the latest subsequent offer of defendants, be accorded judicial approval."

Following Mr. Fitzsimmons' report as Referee in the Zenn litigation and as Special Master in the Breswick action, the matter of confirming the respective reports was argued extensively in this Court and in the New York State Supreme Court. In the Zenn litigation Mr. Rosen, as objectant, filed exceptions to the Referee's report and thereafter briefs were filed in support of and in opposition to the confirmation of the Referee's report.

On March 12, 1959, after considering the briefs submitted and hearing oral argument, Mr. Justice McGivern of the New York Supreme Court approved the proposed settlement in the Zenn litigation. He stated that

"* * * this court is of the opinion that the original stipulation of settlement herein, as now augmented by the latest subsequent offer of defendants, is fair and reasonable, was negotiated at arms' length, is free from fraud or collusion and is in the best interests of the Alleghany Corporation and its stockholders. Accordingly, approval is accorded the proposed compromise, and the Referee's report is confirmed and adopted as the decision of this court."

Mr. Justice McGivern held, however, that the injunctive order in the Breswick action pending in the Federal Court constituted an impediment to the conclusion of the settlement and directed that no order be entered on his decision until he had been advised by affidavit that the Breswick injunction had been lifted.

In the Breswick litigation in this Court, plaintiffs moved for an order rejecting the recommendation of the Special Master in his report of November 17, 1958, and defendants filed a cross-motion requesting confirmation of the Master's report. This was argued before Judge Dimock. On September 22, 1959 Judge Dimock rejected Mr. Fitzsimmons' report as Special Master and referred the matter back to him for further hearings as to whether the injunctive order of October 27, 1955 should be vacated.

It was at this point that negotiations were entered into which are directly related to the matter now in issue before this Court.

It appeared to Phillips, who was a consultant to Brussel in the Breswick litigation, and to Graubard, as attorney for objectant Rosen in the Zenn litigation, that the order of Judge Dimock gave them a veto power over any settlement and improved their position consid-

erably. Phillips communicated with Ireland by telephone, advising him that as a result of Judge Dimock's decision new hearings would be held at which Kirby would have to testify and he indicated that the testimony Kirby might be compelled to give might be disastrous to him. It was indicated, however, that further settlement discussions between Phillips and Ireland might be held. Ireland and Phillips had become friends when they were both employed by the New York Central Railroad Company in connection with a proxy fight which resulted in Robert R. Young getting control of that railway. Phillips' association with the railroad was terminated on September 30, 1954. Young had, however, suggested to Ireland that he remain on friendly terms with Phillips, knowing that Phillips was then actively associated with the minority stockholders' litigation which had been brought against directors of Alleghany Corporation. Ireland had kept himself familiar with this derivative litigation from 1955 forward.

Prior to January 25, 1958, Young was the Chief Executive Officer of Alleghany, as well as Chairman of the Board of New York Central. On that date he died. Shortly after his death Kirby became Chief Executive Officer and Chairman of the Board of Alleghany.

After Judge Dimock's decision on September 22, 1959, Kirby either directly or indirectly authorized Ireland to explore settlement possibilities of the derivative litigation with Phillips. At that time Mr. Daly, of the firm of Lord, Day & Lord, was representing Alleghany Corporation and Kirby and the other defendants. Ireland met with Daly and suggested that he have discussions with Phillips. Daly, who was not enthusiastic about the prospect, nevertheless said he would not stand in the way of efforts to reach a settlement. Apparently the various parties had reached an impasse in their settlement negotiations. Daly and Graubard had not been able to agree on the procedure to be followed in the settlement negotiations. Daly wanted Pomerantz to be present during negotia-

tions but Graubard objected to that. Daly and Mr. Adams (who represented the Murchisons) took the position that Phillips should not be allowed to participate in the settlement discussions. As time went on they would not talk to him at all. An impasse also existed between Brussel and Daly. Brussel apparently felt that he could not deal with Daly on the basis of confidence.

At this point the avenue of communication so necessary in reaching a settlement seemed to have dried up, but Phillips and Ireland still remained friendly and this avenue of communication remained open. Daly, who represented a number of the defendants in the derivative actions and also represented Alleghany Corporation, thought that new hearings should take place before the Special Master and that Kirby should testify thereat. He felt confident that plaintiffs would not be able to recover in the derivative actions. Kirby, however, felt that the litigation had gone on so long, was so expensive and so disruptive of the corporate business of Alleghany Corporation, that efforts should be made to settle.

At the same time the attorneys for the plaintiffs were having difficulties. Rosen, the objectant in the Zenn State Court action, refused to authorize the expenditure of funds for an appeal from the approval of the Special Master's report. The Breswick plaintiffs were Dr. Bailey, Carl Bresnick and Myron Neisloss. Dr. Bailey retained new counsel and directed him not to continue further with the litigation. Carl Bresnick died a day or two after Judge Dimock's decision, and Phillips learned subsequent thereto that he had previously sold his Alleghany shares. Neisloss, in view of Bresnick's death, did not want to be obligated for any further disbursements and cancelled Phillips' power of attorney and retained new counsel. Phillips felt, in view of those developments, that he would use his best efforts to "bring this rather leaking ship safely into port." Apparently defendants were not aware of these difficulties of the plaintiffs.

Phillips, with his customary degree of energy, did not allow the unseaworthy condition of his ship to deter him from further activities. In the Fall of 1959 the case of Neisloss v. Arpaia,[1] in which Phillips was a co-plaintiff, was activated. Phillips also threatened to sue Alleghany with respect to the legal fees Alleghany had paid to its counsel Lord, Day & Lord. Phillips also served a demand upon the corporation for a list of its stockholders. None of these activities was particularly comforting to the defendants.

At any rate, by the Fall of 1959 the stage was set for settlement discussions in the Zenn and Breswick cases. Kirby admittedly was interested in seeing whether a settlement could be arrived at.

On October 12th Kirby wrote to his attorney, Daly, inquiring what his maximum liability would be in the event plaintiffs were successful in all of the actions which they had brought. Daly replied by letter dated October 22, 1959. He indicated that it was impossible to give an accurate estimate of the liability in all of the actions. He stated, however, that liability in connection with the 1950 IDS Exchange Transaction might, alone, cost Kirby $22,800,000, or, if he were held jointly liable with others who participated in the transaction his liability might be $39,350,000. Daly testified at the trial that he did not believe that plaintiffs would have been successful in the derivative actions which they had brought, and that his estimate of maximum liability was based upon the assumption that they were successful in all aspects of their cases, although he did not believe that would be so.

Kirby, in any event, authorized Ireland to conduct settlement negotiations with Phillips, it being understood that Ireland had no authority to make a final settlement without the approval of Kirby. Brussel and Graubard were agreeable to Phillips conducting settlement negotiations with Ireland, with the same understanding that the settlement discussions would be tentative and he would have no authority to make a final agreement.

Ireland had expressed the view that no settlement could be achieved unless arrangements were made in it to provide Phillips with a position of compensation and status. He had so expressed himself to Kirby and Kirby's associates. He had the impression, as did some of the others involved in the litigation, that Phillips controlled the litigation of the minority stockholders. Daly stated that he believed Phillips controlled this litigation. Graubard denied that Phillips controlled the litigation. There was no doubt, however, that Phillips, as consultant to the attorneys representing the minority stockholders, had a very important position in the litigation and that his reaction to a settlement offer might in fact prove decisive. The fact that he was used as a conduit for settlement discussions with Ireland also enhanced his position.

We now come to the point which involved the issue of fact in this case. Plaintiff Alleghany Corporation contends that the settlement which was finally arrived at was one which was achieved only because Kirby had entered into a covert, undisclosed understanding with Phillips that Phillips would be rewarded by being given a position in the Alleghany Corporation complex which would provide him with status and compensation, and that this was a secret understanding which Phillips did not disclose to the Court or to the stockholders whom he was purporting to represent. Kirby and Phillips denied any such understanding.

In the event that there was such an understanding between Phillips and Kirby it might indeed have been a basis for setting aside the settlement, since such understanding, if it existed, was not reported to the Court or to the stockholders of Alleghany. Phillips, as a consultant to counsel for the minority stockholders, stood in a fiduciary position. As a proponent of the settlement subsequently arrived at, and being in such po-

1. Reported as Neisloss and Phillips v. Bush, 110 U.S.App.D.C. 396, 293 F.2d 873 (1961).

sition, if such a secret understanding existed Phillips was obligated to reveal it to his principals, the Referee and the Court. In essence, plaintiff contends that Phillips accepted a bribe for his own personal benefit to bring about a settlement of the litigation and that because of this bribe he was ready to enter into a settlement less advantageous to his principals than would otherwise have been the case. This presents a pure issue of fact as to whether such secret agreement did exist. It is the issue on the first aspect of the case.

(1) WAS THERE A SECRET UNDERSTANDING BETWEEN KIRBY AND PHILLIPS, NOT REVEALED TO THE COURT, THAT TO INDUCE PHILLIPS TO RECOMMEND AN ADVANTAGEOUS SETTLEMENT FOR KIRBY, KIRBY WOULD PROVIDE PHILLIPS WITH A POSITION OF SUBSTANCE AND STATUS IN THE ALLEGHANY PICTURE?

This issue is presented by Paragraph 44 of the complaint which alleges:

"44. In or about October, November or December, 1959, Phillips, Kirby and Ireland entered upon a conspiracy to the effect that, in return for Phillips' betrayal of his fiduciary duties to this Court, to the New York Supreme Court, to Alleghany and its stockholders and to the plaintiffs in the Derivative Actions and in return for his advocacy of the acceptance of a separate settlement by Kirby of Kirby's personal liability upon terms favorable to Kirby and against the corporate interest of Alleghany and IDS, Kirby would secure to Phillips the following personal benefits:

"(a) A position of prominence as a director or officer of IDS, Alleghany or one of its affiliates;

"(b) A substantial voice in the management and operation of IDS or Alleghany or an enterprise controlled by Alleghany or Kirby;

"(c) Employment as a consultant or otherwise by IDS, Alleghany or one of its affiliates at a substantial salary;

"(d) Other emoluments or benefits which are not now known to plaintiff."

To put this issue in perspective it is probably proper at this time to point out that the settlement agreement which was subsequently arrived at between Kirby and the minority stockholders, and approved by the Court, did not provide any special emolument or position for Phillips. However, some months after the settlement agreement was made and the actions disposed of, Phillips, on the recommendation of Kirby was made a director of IDS, a subsidiary of Alleghany Corporation. Plaintiff contends that this position was the result of an agreement made between Kirby and Phillips, through Ireland, prior to the settlement. Kirby and Phillips denied that there was any such agreement.

Since the charge of the plaintiff was a very serious one the Court allowed the plaintiff wide latitude in pre-trial discovery. Numerous depositions were taken of all the persons who participated in the settlement discussions. The trial allowed a complete exploration of all the discussions and negotiations between the parties to see if there was any indication of the existence of such an agreement. No direct testimony was given by any person or party as to any such secret agreement or understanding. In fact, it was denied by all the principals to these negotiations. Plaintiff, in essence, admits that there was no direct testimony of any such secret understanding or agreement. In its brief, at page 74, plaintiff says:

"It is respectfully submitted that the inferences plaintiff urges here, when considered as a whole, give rise to a conclusion virtually as compelling and as certain as one supported by direct evidence of an express agreement."

It therefore become necessary to consider the testimony to see what inferences can be drawn from it. In this con-

nection the Court finds the following facts:

During the Fall of 1959 Kirby did not talk directly to Phillips. There was, however, a series of discussions between Phillips and Ireland looking toward settlement of the litigation. Ireland reported back to Kirby whatever he considered of importance. Ireland also reported to Daly, and Daly kept Adams (the attorney for the Murchisons) and Pomerantz informed of his talks with Ireland.

On November 18, 1959 Phillips and Ireland had a conversation in the course of which Ireland asked Phillips how his group would react to an offer of $900,000 from each of the three major defendants, the Murchisons, the Young estate and Kirby. During this same discussion Ireland suggested that it might be possible to arrange a consultantship for Phillips. Ireland could not remember that any specific amount was mentioned. Phillips, however, testified that a figure of $45,000 a year for ten years was mentioned, and the Court accepts Phillips' testimony as accurate in this respect because apparently this figure is reported in a contemporaneous memorandum of Phillips. The memorandum indicates, however, that the consultantship was not to be a secret matter but something which was to be revealed to the Court as part of the settlement. Phillips rejected the offer of the consultantship. He, Graubard and Brussel determined that they would use this offer as a means of securing an additional sum for Alleghany Corporation. They suggested that the sum if capitalized would be the equivalent of one million dollars and therefore suggested that an additional sum be paid in the settlement to Alleghany Corporation.

Sometime after November 18, 1959, Kirby asked Daly to see Mrs. Young and ask her if she would be willing to pay an additional $900,000 toward settlement of the liabilities of the Young estate. Daly reported that Mrs. Young was not willing to do so. Kirby then determined to ascertain whether he could settle his individual liability separate and apart from the liability of the other defendants. He asked Daly for an opinion as to whether he could settle individually. Daly felt that because of Mrs. Young's unwillingness to go through with a separate settlement he was in a position where there might be a conflict of interests between Mrs. Young and Kirby. Daly did not advise Kirby as to whether Kirby could settle individually, feeling that the conflict of interests between Kirby and Mrs. Young might prevent him from giving such advice.

The settlement negotiations continued. Ireland finally came up to $1,000,000 in cash and ultimately to $1,100,000 in cash for settlement of Kirby's individual liability, in addition to whatever Kirby's obligation was under the Basic Settlement, which, Ireland told Phillips, would amount to either $134,000 or $150,000. Mr. Kirby felt that he could pay this amount since, because of his tax bracket, the payment of $1,100,000 after taxes would cost him only $99,000 net.

Phillips discussed this increased offer with Graubard and Brussel. They instructed him to tell Ireland that the figure of $1,100,000 was agreeable. Graubard thought that the point of settlement on the best terms possible had now been reached and he and Brussel instructed Phillips to close on that figure.

Kirby, as a result of Daly's failure to give him advice on the question of whether he could settle individually, decided to change attorneys. He retained the firm of Donovan, Leisure, Newton & Irvine to represent him and they were substituted for the firm of Lord, Day & Lord, with the understanding that they would try to work out a settlement of Kirby's individual liability in the derivative stockholders' actions, if that could be done prior to the end of the year. This date for the settlement was fixed by Mr. Kirby for tax reasons.

Thereupon, on December 19th and 20th, 1959, intensive negotiations took place at the office of Donovan, Leisure between Newton and Teitelbaum, of that firm, Graubard, Brussel and Phillips. The testimony of all those who partici-

pated in those settlement discussions was that at no time was there any suggestion of any separate side agreement with Phillips, or any understanding that Phillips was to be rewarded individually in a secret manner for sponsoring the settlement.

Part of the Basic Settlement was the return of the control of IDS from the Murchison Brothers to Alleghany. It appeared that Phillips, Brussel and Graubard were very suspicious that there had been a side agreement between Mr. Young and the Murchisons that even if the return of IDS was consummated nevertheless the Murchisons would be allowed to run IDS. They were worried that this agreement would carry over, even though Mr. Young had died. Therefore they made suggestions that the stockholders' group bringing the derivative actions should be given a "watchdog" seat on the board of IDS. Phillips testified that while he would have liked to have the post for himself he thought it might well and probably would go to Brussel. Phillips reported to Graubard that he had discussed the subject with Ireland and that Ireland had no objection to such a director on the IDS board if control of IDS was returned to Alleghany. Ireland reported Phillips' demand for a watchdog directorship to Kirby sometime after the middle of December 1959. Kirby refused the demand. He said that nobody need be concerned about the integrity of the settlement and that he would protect the interest of IDS just as well as anybody, and that it was ridiculous for anybody to dictate to him who was going on what board. At the discussions at the office of Donovan, Leisure which eventuated in the final settlement agreement, Kirby definitely refused to make any agreement that there be a watchdog director on the board of IDS. Kirby said that any such proposal was completely out and "to hell with that." Graubard testified that Teitelbaum told him "we would not get a seat and we would have to rely upon Mr. Kirby's good faith in the administration of the affairs of Alleghany to see to it that full control

over the affairs of IDS was revested in Alleghany." He said that "Mr. Brussel and I discussed this alone as well as with Mr. Phillips and we accepted it." He said the demand was "surrendered."

The settlement agreement arrived at at the office of Donovan, Leisure on the 19th and 20th of December provided generally that Kirby would make a payment of $1,100,000, plus his obligation under the Basic Settlement. It was further agreed that in the event the Murchisons and Mrs. Young did not go along with the settlement that Kirby could be released from his obligation under the Basic Settlement by a payment of $150,000.

On December 22, 1959 the parties appeared before Judge Dimock to obtain his approval of a consent order vacating the injunction of October 27, 1955 as to Mr. Kirby. Judge Dimock had directed that the other parties to the litigation should be notified of the application. At Mr. Adams' request the hearing was adjourned to the following day. At the appearance before Judge Dimock on the following day Mr. Adams, representing the Murchison Brothers, vigorously opposed the proposed order claiming that it would prejudice his clients. Judge Dimock informed Adams that "in the absence of something extraordinary" he would sign the proposed order on the following day, December 24th.

On December 24, 1959 Mr. Daly advised Judge Dimock that the Young Estate was willing to contribute an additional $900,000 to the Basic Settlement. Adams reported to the Court that the Murchison defendants and the Young Estate had agreed upon settlement of the action on that basis. Accordingly Brussel, as counsel for the Breswick plaintiffs, agreed to the vacating of the 1955 injunction as to the remaining defendants.

Between December 24th and 28th, 1959, negotiations were had looking to the effectuation of the settlement in the State Court proceedings before Mr. Justice McGivern. Plaintiff's counsel was still suspicious that the return of control of IDS to Alleghany would be a formality rather than a reality and that there was

a secret understanding with the Murchisons which would make this a formality. Therefore when the parties appeared before Mr. Justice McGivern on December 28th the order settling the action as to the Murchisons included a provision requiring Murchison Brothers to use its best efforts to enable Alleghany Corporation to have nominees of Alleghany's designation elected as directors of IDS at the next annual meeting of stockholders to be held in April 1960.

On December 28, 1959 the order of the Supreme Court of New York County was entered approving the settlement as to Kirby and on the following day the Court approved the settlement as to the other defendants. On December 29th Alleghany delivered a limited release to Kirby releasing him from all claims of any kind or nature embraced in the Zenn action, excluding from the release only those obligations which Kirby had yet to perform in connection with the provisions of the Basic Settlement. On February 18, 1960, pursuant to the provisions of the order of the Supreme Court, Alleghany issued a release to the Young Estate and thirteen other defendants in the Zenn action. In March 1960 similar releases were issued to the Richardson Estate and to Murchison Brothers.

On April 7, 1960 the Murchisons transferred to Alleghany their shares of voting common stock in exchange for nonvoting common stock. On May 13, 1960, after this transfer of control had been made by the Murchisons, and all the other provisions of the Basic Settlement in the Zenn action had been consummated, Alleghany issued general releases in the same form to each of the nineteen defendants in the Zenn action. On June 21, 1960 a judgment dismissing the action on the merits as to all parties was entered in the Zenn action in the New York Supreme Court.

The issue of fact which the Court has to decide is whether, prior to the action of the New York Supreme Court in approving the settlement, there was any secret, covert understanding between Kirby and Phillips, whereby Phillips was to be rewarded with a position of status and compensation in return for approving the settlement with Kirby. There was no evidence given by any party to the negotiations that there was such an understanding.

In response to a question having to do with the alleged secret understanding between Kirby and Phillips, Phillips testified as follows:

"Q. At any time in any of those discussions with Mr. Ireland or with Mr. Wallace to the limited extent stated, was there ever any suggestion made by either Mr. Ireland or Mr. Wallace of any personal arrangement for you to not be made a part of the proposed stipulation and placed before the Court?

"A. At no time, sir."

Kirby's testimony, in answer to a question of the Court on this point, was:

"THE COURT: * * * Mr. Kirby, at any time during the negotiations of this settlement of your individual liability, did you either directly or through Mr. Ireland or anybody else promise Mr. Phillips something for his own account or his own benefit?

"THE WITNESS: No, sir, never."

When Mr. Graubard was on the stand he was asked:

"Q. Did Mr. Phillips ever tell you that as of the fall of 1959 he had a meeting of the minds, an understanding, with Mr. Ireland that if a tripartite settlement was to be consummated, he, Phillips, would have a directorship in IDS?"

"A. No, sir."

In response to questioning by the Court, Mr. Newton testified:

"THE COURT: You were right in the middle of all this. Was there any intent and understanding that Mr. Phillips would be one of the directors of IDS at this time?

"THE WITNESS: No, sir.

\* \* \* \* \* \*

"THE COURT: You got no impression that there was such an understanding?

"THE WITNESS: No \* \* \*."

Again with reference to the matter of a secret understanding between Kirby and Phillips, the Court asked Mr. Teitelbaum:

"THE COURT: As of this date of February 1, 1960, did you have any feeling that there was any understanding that Mr. Randolph Phillips was to go on the board of IDS?

"THE WITNESS: Most certainly not, sir. Everything I knew was to the contrary."

Relative to the discussions which led to the ultimate settlement in the Fall of 1959, Mr. Daly, in response to questions put to him by the Court, testified:

"THE COURT: Anywhere along in those discussions did you get the impression that there was any agreement either express or implied that Mr. Phillips was to go on the board of IDS or some other company?

"THE WITNESS: No, sir.

"THE COURT: Did you get any impression anywhere along the line that Mr. Kirby had made some implied commitment to Mr. Phillips to give him a position of stature and compensation?

"THE WITNESS: No, sir."

It was the events after the approval of the settlement which lead the plaintiff to urge that the Court must draw inferences that there had been a pre-existing understanding for such bribe to Phillips.

Shortly after the settlement had been approved by the New York Supreme Court discussions did take place as to whether Phillips should be placed on the board of IDS. Early in January of 1960 Phillips came to the office of Alleghany Corporation and asked Kirby to consider putting him on the board of IDS. Kirby answered that if he did anything like that he was sure a lot of people would think he ought to have his head examined. At or about that time there was a threat of a proxy fight at Alleghany Corporation posed by Mr. Sonnabend and Mrs. Young in opposition to Mr. Kirby. In a conference as to Phillips' future position in the Alleghany picture, Mr. Newton indicated to Mr. Kirby's associate that he thought Phillips undoubtedly irritated people but that he was a good person to have on your side in a proxy fight, and that Phillips had told him that while he would prefer to be aligned with Kirby's forces in the proxy fight, if he were not so aligned he would consider an offer from Sonnabend.

Due to the return of control of IDS to Alleghany Corporation it became necessary to consider the personnel of the board of IDS. That company had previously been controlled by the Murchison Brothers. To carry the return of control into effect it would be necessary to replace certain directors then on the board with directors primarily representative of Alleghany Corporation.

Kirby testified that he began thinking about the fact that Alleghany, which had controlled IDS for some five years, had now been out of control for five years. After that absence of control he felt that he ought to do something to find out what had gone on at IDS. He therefore had a discussion with his attorney, Mr. Newton, in which the subject of Phillips being nominated to the IDS board was discussed. Kirby testified that he thought it was about time he found out what was going on under the Murchison management because they had been awarding brokerage business on a favoritism basis and there was no telling what else they had been doing. Newton agreed with Kirby. He had been telling Kirby for some time that he should ascertain the facts because of certain ugly rumors. He urged an investigation. Kirby asked Newton if he would go to Minneapolis to make the investigation but Newton said he had too many commitments to do that and would not have the necessary authority simply as counsel for Alleghany. Kirby then asked if Phillips could make the investigation and Newton agreed that

Phillips would be well qualified, but pointed out that he would have to have some authority to make an investigation. Kirby then said that if Phillips should be made an IDS director that would give him the authority to get the information needed. Also, Kirby had previously participated in a meeting at which Newton discussed the advisability of having Phillips on his side in the event he became involved in a proxy contest.

We have, therefore, a situation where after the settlement had been consummated and the control of IDS had been returned to Alleghany Corporation there was some doubt as to whether Alleghany was in a position effectively to exercise that control and to find out what had happened during the period of Murchison control. There was also the threat of a proxy fight in Alleghany Corporation.

On April 8, 1960, Brussel wrote to Newton pointing out that there were some doubts as to whether the integrity and spirit of the settlement of December 29, 1959, whereby control of IDS was to be returned to Alleghany, was going to be compromised by developments which had taken place since that date. Brussel requested on behalf of his firm, and on behalf of Graubard, that "Alleghany Corporation include Mr. Randolph Phillips among its nominees to the IDS board at the 1960 annual meeting of stockholders."

Mr. Kirby apparently decided that taking all the factors into consideration it would be desirable to place Phillips on the board of IDS. This conclusion on his part does not seem to be improper. He wanted the assistance of Phillips in the event of a proxy fight in Alleghany Corporation. He realized that the minority stockholders who had carried on the derivative litigation for years were suspicious as to whether Alleghany had actually gained control of IDS. The one way to lay any such suspicions to rest would be to put a representative of these stockholders on the board of IDS. There was no doubt that Mr. Kirby did not like Phillips. Phillips and his associates had bedeviled him with expensive litigation;

they had made charges against him which were serious. If peace were to be maintained it was probably necessary that Kirby see to it that those who had brought the litigation would have no suspicions as to the integrity of the settlement. As early as December 22, 1959, while the settlement negotiations were going on, Kirby advised his close associate Eppler that he thought he would be able to settle the litigation but said, "of course, now I may have to put Phillips on the IDS board." Phillips, undoubtedly, either from Brussel, or elsewhere, received word that he was being urged for that position on the IDS board. On April 18, 1960 he wrote to Kirby and said that if he were made a director of IDS he was not going to show favoritism to anybody and that the Murchisons were entitled to as much respect from him as a director as anybody else.

Mr. Kirby finally decided that Phillips would be a good nominee for director of IDS. He wrote Phillips a letter to that effect dated April 15, 1960 which Phillips did not receive for several days thereafter. In the letter to Phillips Mr. Kirby said:

"It is with some misgivings that I have put you on the 1960 Investor's Diversified Services slate. Not because of any lack of confidence in you on my part, but because, whether you realize it or not, you are a *very controversial* figure. It, therefore, behooves you to step carefully and to remember that you are on trial, at least until you have gained the confidence, respect and, yes, friendship, if possible, of those who you know are antagonistic to your going on the Board. I know you will try hard to accomplish this, if only to justify my confidence."

The nominees of Alleghany Corporation for the IDS board, including Phillips, were elected on April 19, 1960. This matter was reported in the press.

■ The Court concludes that the plaintiff has failed to establish that there was any secret understanding between Kirby and Ireland and Phillips whereby

Phillips was to gain a position of status and compensation in return for assisting in securing a settlement satisfactory to Kirby. The evidence was all completely to the contrary. The inferences which plaintiff seeks to draw from the fact that Phillips after the withdrawal became a director of IDS do not warrant the conclusion that this was pursuant to a pre-existing agreement. Plaintiff's position is a typical example of the logical fallacy of *post hoc ergo propter hoc.*

█ Plaintiff had the burden of proof of establishing that there was fraud permeating the settlement and that this fraud was a breach of a fiduciary obligation of Phillips to the minority stockholders in that he made a secret agreement for his own benefit which was not revealed to the Court. Plaintiff has failed completely to establish this as a matter of fact.

This brings us to the second point urged by the plaintiff:

(2) WAS THERE SUCH FRAUD AS WOULD REQUIRE SETTING ASIDE OF THE ORDER OF THE NEW YORK STATE SUPREME COURT AND THE RELEASE GRANTED PURSUANT THERETO TO KIRBY BY REASON OF THE FAILURE OF KIRBY TO ADDUCE BEFORE THE STATE COURT OR ITS REFEREE CERTAIN FACTS MATERIAL TO AN EVALUATION OF KIRBY'S LIABILITY ON CLAIMS ARISING OUT OF THE 1950 EXCHANGE TRANSACTION

Plaintiff alleges in Paragraph 39 of the amended and supplemental complaint that Kirby failed to adduce or cause to be adduced before the Referee, the Special Master and the Courts, certain facts relating to the 1950 Exchange Transaction. Plaintiff alleges that by reason thereof the order of the New York Supreme Court confirming the report of the Referee was the result of fraud.

There was no indication that Mr. Kirby had ever been subpoenaed or required to produce any records before the Referee. He was not a witness before the Referee. He had not been served in the Zenn action. The plaintiff contends, in effect, that Kirby was under an affirmative duty to volunteer to come forward with facts in his possession or under his control relative to IDS, even though he was not asked for them by any of the parties to the hearing before the Referee. This is not a question of Kirby altering or concealing any facts, but rather a question of whether he was under an affirmative duty to present facts which might have a bearing upon his liability.

The issue before the Referee was whether or not the proposed settlement of the claims asserted in Zenn v. Anzalone was fair and reasonable. For the purpose of making that determination the Referee necessarily inquired into the merits of the various claims asserted in the action, including that of the 1950 Exchange Transaction. The Referee's inquiry was, of course, solely for the purpose of determining the reasonableness of the settlement, not to try the claim as such.

█ The objectants to the settlement had a full opportunity to demand and require any papers which they thought material in connection with this hearing. That they took this obligation seriously was shown. They served a subpoena duces tecum on Alleghany Corporation in response to which more than 28 files of that corporation were produced which Graubard, counsel for the objectant Rosen, and his staff examined for over 64 man-hours. Graubard was satisfied that Alleghany had produced everything in its files called for by the subpoena. Robert R. Young's files relating to IDS were also produced and similarly examined. He testified at length before the Referee with respect to the 1950 Exchange Transaction. Robert Purcell, a director of IDS from the time of its acquisition by Alleghany in 1949 and a former president and then Chairman of the Board of IDS, responding to a subpoena duces tecum served by Graubard, produced a large number of documents. He also testified

at length. The hearing on the settlement was well described by the Referee in his report as in the nature of an adversary proceeding. In such a proceeding the proponents of the settlement of course had the burden of establishing the fairness of the settlement. The objectants contested the fairness of the settlement. They had the full discovery proceedings of the State Court at their disposal in establishing their position.

Now Alleghany Corporation, which was one of the proponents of the settlement, comes in and says that Kirby failed in a duty because he did not come forward and volunteer certain information for which he was not asked in the course of the hearing on the settlement. The documents which it is contending Kirby should have produced were documents found in the course of discovery proceedings in *this* action which were in the files of IDS or in the files of Kirby at his home in New Jersey. Whether any of them are of such materiality that they would have affected the conclusion of the Referee will be discussed later in this opinion. That is an issue of fact.

Before we get to that, however, there is a fundamental question of law as to whether under the circumstances it would be sufficient fraud to warrant setting aside the judgment and release for Kirby to have failed to volunteer and come forward with this material at the hearing before the Referee. This is an issue of law.

This raises the issue as to whether the fraud alleged by the plaintiff is that which is denominated by the law as "extrinsic" or "intrinsic."

■ ■ In cases seeking to set aside the judgment of another Court, or to prevent a party from pleading that judgment as *res judicata,* the Courts have drawn a distinction between extrinsic fraud and intrinsic fraud. The distinguishing between extrinsic and intrinsic fraud is an attempt by the Courts to reconcile two competing considerations— justice to the parties and a finality of litigation. See United States v. Throckmorton, 98 U.S. 61, at pp. 68–69, 25 L.Ed. 93. The distinction between extrinsic and intrinsic fraud was well expressed by Judge Phillips in Chisholm v. House, 160 F.2d 632, at p. 643 (10th Cir., 1947). He said:

"* * * Fraud is regarded as extrinsic or collateral where it prevents a party from having a trial or from presenting his cause of action or his defense, or induces him to withdraw a defense, or operates upon matters pertaining not to the judgment itself, but to the manner in which it was procured. Where, however, the judgment was founded on a fraudulent instrument or perjured evidence, or the fraudulent acts pertained to an issue involved in the original action and litigated therein, the fraud is regarded as intrinsic."

■ ■ The distinction between extrinsic and intrinsic fraud is important because New York allows collateral attack upon any judgment only when extrinsic fraud is established. In Crouse v. McVickar, 207 N.Y. 213, 218, 100 N.E. 697, 45 L.R.A.,N.S., 1159 (1912) the Court said "fraud for which a judgment can be impeached must be in some matter other than the issue in controversy in the action." See Jacobowitz v. Metselaar, 268 N.Y. 130, 197 N.E. 169, 99 A.L.R. 1198 (1935); Chenu v. Board of Trustees, Police Pension Fund, 12 A.D. 2d 422, 212 N.Y.S.2d 818 (1961); Cohen v. Randall, 137 F.2d 441 (2d Cir., 1943), cert. denied, 320 U.S. 796, 64 S.Ct. 263, 88 L.Ed. 480 (1943).

■ A federal court sitting in a diversity of citizenship case is obligated to adhere to state substantive law.[2] Erie

2. A dictum somewhat to the contrary on the issue of applying the rule of extrinsic fraud appears in Griffith v. Bank of New York, 147 F.2d 899, 160 A.L.R. 1340 (2d Cir., 1945). The precise issue was not squarely before the court since it held the fraud in that case to be extrinsic and thus capable of collateral attack by both New York and federal law. The cases relied on by the court were pre-Erie cases.

R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

In 7 Moore, Federal Practice ¶ 60.-37[3] (2d ed.), page 634, the author writes, "a federal court sitting in another state, which allows relief only where the fraud is extrinsic, should not grant relief from a judgment of that state on the basis of intrinsic fraud * * * Certainly the policy of Erie-Tompkins demands this where the state court judgment was rendered in a case involving only non-federal matters; and, further, the policy is in accord with that underlying res judicata and full faith and credit."

Reiter v. Universal Marion Corporation, 112 U.S.App.D.C. 68, 299 F.2d 449 (1962) is closely in point. A derivative stockholders' suit was instituted in the district court for the District of Columbia but was not reached for trial until a similar suit against the same defendant in the New York Supreme Court had been settled and judicially approved. The plaintiff sought to attack collaterally the New York settlement by alleging fraud because of the failure of the corporate directors to disclose material facts bearing on the fairness of the settlement. The Court of Appeals in affirming the dismissal of the suit said:

"* * * But regardless of what the true reasons for the acquisition may have been, we are bound by the New York law on the matter, and it seems clear that the New York courts would not permit a collateral attack upon a settlement and resulting judgment on the basis appellants urge. See Crouse v. McVickar, 207 N.Y. 213, 100 N.E. 697, 45 L.R.A., N.S., 1159 (1912); Chenu v. Board of Trustees, 12 App.Div.2d 422, 212 N.Y.S.2d 818 (1961)." 299 F.2d 449, at page 453.

Similarly, in O'Boyle v. Bevil, 259 F.2d 506 (5th Cir., 1958) the Court looked to the law of Texas to determine the permissible scope of collateral attack on a judgment rendered by a court of that state. Judge Tuttle, speaking for the Court, stated:

"* * * Questions as to the setting aside of judgments are difficult at best. This difficulty is increased when attack is made in a federal court on a state court judgment. There is one principle, however, that stands out clearly in this area of controversy. That is that in diversity cases, a federal court may set aside a state court judgment for equitable grounds that are recognized by the state as a basis for such action. When, as is true in Texas, a judgment can be set aside for want of jurisdiction or for fraud, the federal court, exercising its equity jurisdiction, can act similarly in a diversity case." 259 F.2d 506, at pp. 511–512.

The Court concludes that the only basis upon which the judgment of the New York State Court approving the Zenn settlement could be disregarded would be if extrinsic fraud were established.

The alleged fraud upon which plaintiff relies in this case cannot be denominated extrinsic fraud. Plaintiff seems to contend that Kirby was under an obligation to establish the bona fides of the 1950 Exchange Transaction. If there had been a trial on this issue that undoubtedly would have been true. In establishing the sufficiency of the settlement the Referee and the Court also had to keep in mind the question of Kirby's knowledge of the underlying facts. If Kirby had testified at the hearing before the Referee and had testified falsely, or had produced false documents, the fraud would be denominated as intrinsic and would not be subject to collateral attack. It is difficult to understand how this can be changed to extrinsic fraud by failure to produce documents or a failure to testify. Mere failure to produce evidence before the Referee or the Court, which might have been useful in determining the matter in issue is not extrinsic fraud. This is well established in the New York State Courts.

Thus, in In re Adoption of Brundage, 134 N.Y.S.2d 703 (Sup.Ct., Or.Cy.1954) aff'd, 285 App.Div. 1185, 143 N.Y.S.2d 611, appeal denied, 285 App.Div. 1013, 144 N.Y.S.2d 921 (1955), a prior adoption proceeding was challenged because the deceased foster parent had withheld information from the Court. The Court held:

> " * * * [T]he failure of the judge to thereby become informed of certain material facts which would have a bearing upon the question of whether or not the adoption was to be confirmed by him may not be successfully urged as a ground for the setting aside of the order of adoption. The general rule is that the authority to set aside a judgment or order of the court for fraud is limited to cases of fraud which are extrinsic and collateral to the matters in issue. The mere failure of a party to disclose to a court matters pertinent to the issues which would defeat his claim is not such extrinsic fraud as will require the setting aside of a judgment in favor of the claim." 134 N.Y.S.2d 703, at pp. 709–710.

Reiter v. Universal Marion Corporation, supra, applying New York law, reached the same conclusion:

> " * * * Appellants' most substantial point is that defendant-appellees Rittmaster and Mullaney, directors who testified at the New York hearing, did not reveal that the Merritt Company 'or its designee' had a contractual right to buy the Savin shares at a lower price than Universal Marion paid. * * * [I]t seems clear that the New York courts would not permit a collateral attack upon a settlement and resulting judgment on the basis appellants urge. * * *" 299 F.2d 449, at p. 453.

The plaintiff herein cannot collaterally attack the settlement approved of by Mr. Justice McGivern. The conduct of Kirby, if fraudulent, was not extrinsic fraud as defined by New York law. It is not a judgment which could be collaterally attacked in a New York court and therefore a collateral attack must fail in this Court as well.

The plaintiff was allowed to introduce in evidence documents discovered by it in the files of Mr. Kirby and IDS. Most of them were produced from the files of IDS pursuant to discovery proceedings in the instant action. The Court has considered these documents, together with the documents which were actually introduced before the Referee in the Zenn settlement hearings. It does not appear to the Court that the documents upon which plaintiff now relies were of such significance that they would warrant the Court upsetting the decision of the State court in any event.

Essentially the documents relied upon by the plaintiff are accounting documents or actuarial documents relating to a projection of earnings. Thus plaintiff says at page 135 of its brief:

> "The cornerstone of plaintiff's claim of non-disclosure is the area of projection documents that were known to Kirby to Purcell, to Anzalone, to Shipman and readily available at IDS throughout the entire period from the acquisition by Alleghany onward."

However, the fact that there were such projections was well known to the attorneys in the Zenn settlement hearings. Mr. Graubard, who represented the objecting stockholders at the settlement hearings, was asked:

> "Q Do you have any recollection now that any projections or forecasts were furnished to you in connection with those hearings?
>
> "A Yes, sir. I believe that the record will show that there were forecasts, that my briefs to the Referee and Judge McGivern lay stress upon these forecasts, and I have a particular recollection indeed of mention of these forecasts in

correspondence between Mr. Purcell and Mr. Young."

While undoubtedly the accounting and actuarial evidence was the type of evidence that might have been introduced in the hearings if counsel had had it, nevertheless the Court cannot conclude that the failure to have such evidence or to produce it was of such significance that it would have caused the Referee to reach a different conclusion.

█ Plaintiff urges at great length the proposition that a director-defendant has a duty to produce all the facts within his knowledge if he seeks to get a judgment relieving himself from responsibility to his corporation. This may be true. This is his burden of proving to the satisfaction of the Court that a settlement is fair and reasonable. Plaintiff, however, in this case, then transposes the burden of proof into a duty to adduce evidence against oneself. Having the burden of proof means only that the defendants had the burden of affirmatively establishing the reasonableness of the settlement; it does not mean that they had the duty of helping the objectants to the settlement prove it was unreasonable.

█ In the very nature of things the argument of the plaintiff on the failure to produce amounts to nothing more than that plaintiff has some after-discovered evidence which was not asked for at the hearing before the Referee or produced before the Referee. After-discovered evidence may be the basis for seeking a new trial. It is not a basis for collaterally attacking a judgment rendered after trial or a release given pursuant to the judgment.

█ The Court concludes that plaintiff has failed to establish that defendant Kirby committed a fraud upon the State court or its Referee in failing to produce documents at the hearings before the Referee which were not called for at the hearings and most of which were not in his possession but were in the possession of IDS.

## (3) MAY THE COURT DIRECT KIRBY, IRELAND AND FRED M. KIRBY TO REIMBURSE ALLEGHANY FOR LEGAL FEES AND EXPENSES INCURRED BY IT?

On October 7, 1960 the Executive Committee of the Board of Directors of Alleghany approved a resolution authorizing "the appropriate officers of the Corporation [to] take all steps deemed by them to be necessary or proper to contest and defend the Corporation against the following lawsuits in which this Corporation is a party defendant. * * *" The instant suit is one of the three denominated in the resolution. The reason for that resolution is contained in its final paragraph which states that "the institution and prosecution of these three lawsuits is against the judgment and policy of the Corporation as evidenced by the action of the Board of Directors of the Corporation taken on December 29, 1959, approving and ratifying the settlements which these three lawsuits seek to upset, and is against the interests of the Corporation." Among those approving the resolution were Allan Kirby and Fred M. Kirby.

The precise issue raised by this resolution is contained in the "Proposed Statement of Issues" submitted by the plaintiff and adopted by the Court. It reads as follows:

"9. Where Alleghany has been caused by Kirby and Fred M. Kirby to expend monies in payment of legal fees and disbursements on Kirby's behalf and that of others than Alleghany and failed to disclose said payments to the shareholders of Alleghany, should Kirby and Fred M. Kirby be compelled to repay said sums to Alleghany?

█ New York allows a corporation to expend funds in defense of a derivative action presumptively brought in its behalf when some interest of the corporation is threatened. The rule was laid down in Godley v. Crandall & Godley Co., 181 App.Div. 75, 168 N.Y.S. 251 (1917).

aff'd, 227 N.Y. 656, 126 N.E. 908 (1920), where the Court said:

"* * * Ordinarily, therefore, there will be no occasion to spend considerable sums of the corporation's money to defend against an action brought for its benefit. Cases may arise, however, where the interests of the corporation are injuriously threatened by such a suit, or by some incidental relief sought therein. In such a case the directors may properly employ and pay counsel in behalf of the corporation, assuming the burden, if the expenditure is questioned, of showing that some interest of the corporation was in fact threatened, and that, for that reason, the expenditure was justified * *." 168 N.Y.S. at p. 254.

It appears obvious that Alleghany had an interest in defending the settlement by which it had received over $1,100,000. It cannot be said that the interest of the corporation was not threatened by the instant suit.

However, even more important is that no proof was offered by the plaintiff as to the amount of fees expended by it, to whom these were paid, for what services they were paid and whether these were solely for protecting the interests of Alleghany or for protecting the interests of the individual defendants.

This is a suit by Alleghany. Alleghany obviously had the facts within its control. No proof was offered by its attorneys that fees were paid by it for the benefit of the individual defendants. The mere fact that it may have paid fees to protect *its* interest in the litigation does not mean that the individual defendants are under a legal obligation to reimburse it for those fees.

There has been a complete lack of proof sufficient to warrant any direction that defendants Kirby, Ireland and Fred M. Kirby reimburse Alleghany for legal fees and expenses.

*Conclusion*

As is shown by the foregoing findings of fact and conclusions of law, plaintiff completely and utterly failed to establish the causes of action which it has asserted.

Judgment shall be entered for the defendants dismissing the complaint, together with the costs and disbursements of the action.