ALLEGHANY CORPORATION, Plaintiff-
Appellant,

v.

Allan P. KIRBY, Charles T. Ireland, Jr.,
and Fred M. Kirby, Defendants-
Appellees,

Randolph Phillips, Defendant.

No. 173, Docket 28397.

United States Court of Appeals
Second Circuit.

Argued Dec. 2, 1963.

Decided May 19, 1964.

Petition for Rehearing en banc
Granted July 22, 1964.

Stuart N. Updike, New York City
(Townley, Updike, Carter & Rogers,
New York City, on the brief; James B.
Donovan, Lee W. Meyer, Ronald S. Dan-
iels, Richard J. Barnes, Watters & Dono-
van, New York City, of counsel), for
plaintiff-appellant.

Granville Whittlesey, Jr., New York
City (Donovan, Leisure, Newton & Irv-
ine, New York City, on the brief; Roy
W. McDonald, Robert M. Loeffler, Walter
L. Stratton, John J. McCann, Ben Vinar,
New York City, of counsel), for defend-
ants-appellees.

Before MOORE, FRIENDLY and
KAUFMAN, Circuit Judges.

MOORE, Circuit Judge:

For some ten years, the subject mat-
ter of the lawsuit now on appeal has
been before the New York State and fed-
eral courts. The particular aspect now
presented is an appeal from a judgment
in an action in the district court wherein
plaintiff (appellant), Alleghany Corpora-
tion, sought to set aside, as obtained by
fraud, a settlement of stockholders' de-
rivative actions. Alleghany Corp. v.
Kirby, 218 F.Supp. 164 (S.D.N.Y.1963).
This appeal is further limited to the
claim that the settlement was obtained
by defendant (appellee) Allan P. Kirby,
as a result of his failure voluntarily to
disclose upon the settlement certain

facts, essential to a proper adjudication of the fairness and adequacy thereof, alleged to have been known to him at that time. The district court found adversely to appellant.

The transaction giving rise to the many suits originated on December 6, 1949. On that date four officers and directors, including defendant Kirby, voted illegally (so alleges plaintiff) to give themselves an opportunity to exchange Alleghany preferred stock held by them for Alleghany's entire portfolio holdings of 48,225.61 shares of Class A stock of Investors Diversified Services, Inc. (IDS). Pursuant to a December 6, 1949 resolution authorizing an exchange, Kirby tendered his Alleghany preferred stock to Alleghany and Alleghany, in turn, transferred 24,062 shares of IDS stock to Kirby at a price of $8.1453 per share.

By 1954 the price of the IDS stock had advanced to some $200 a share. At such a price Kirby alone had profited at the expense of Alleghany in an amount in excess of $4,500,000. Champions on behalf of Alleghany did not long remain on the sidelines and soon (1954–55) many derivative suits were commenced in both state and federal courts. Other similar suits were brought in the federal court. In accordance with a practice which had developed in the State court to avoid complete chaos amongst the many would-be champions, under the caption of Zenn et al. v. Anzalone et al., Sup.Ct., N.Y.Co., 17 Misc.2d 897, 191 N.Y.S.2d 840 (referred to as the Zenn suits), the ten suits were consolidated and a general counsel (Abraham L. Pomerantz of the firm of Pomerantz, Levy & Haudek) was designated for the plaintiffs in the state and federal suits. Such counsel and his firm were most skilled and experienced (at least for over twenty years) in ferreting out fraud on the part of directors alleged to have been more mindful of serving their own interests than those of the corporations whose interests they should have been serving.[1] Naturally the complainants in the various suits turned their spotlights on the IDS stock exchange and the fact that the beneficiaries thereof knew of, or were in a position to know of, the enormous prospective increase in earnings of IDS.

More specifically, the consolidated amended complaint (First Cause of Action) alleged that Kirby, Robert P. Young and other named co-defendants were engaged in a conspiracy "to enable defendants Young and Kirby to enrich themselves at the expense of Alleghany"; that the IDS stock exchange was to be made at Alleghany's cost or the market price determined as of the final exchange date whichever was higher and "was to be conditional upon ratification by Alleghany's common stockholders at their annual meeting on May 3, 1950"; that the proxy statement was "false and misleading with respect to material facts and omitted to state material facts necessary to make the statements therein not false or misleading," in part, including a failure to reveal not only an actual increase in earnings for the first three months of 1950 (i. e., $2.17 per IDS share, projected as $8.68 on an annual basis) but also a trend to further improvements "foreseeable to and foreseen by the individual defendants"; that 1950 earnings amounted to $20.76 a share; that the earnings trend was reflected in a spectacular increase in market value (also "foreseeable to and foreseen by") to $28, $37.75, $89.50, $100 at the end of the respective years 1950–53 and about $200 at the date of the complaint; that even at the date of the exchange (May 15, 1950) Kirby failed to pay the required consideration in that he paid $148,273.79 less than called for by the respective market prices of Alleghany preferred

---

1. In Heddendorf v. Goldfine, 167 F.Supp. 915, 920 (D.Mass.1958), the court said: "Moreover, Mr. Pomerantz's judgment as to the value of so much of the claims as fall within the first four categories of the complaint is a judgment not only based on painstaking preparation but also reflecting an almost unparalleled experience in this type of litigation. * * * His support of the compromise embodies the pragmatism of a man whose shrewdness few antagonists have ever doubted."

Series A and IDS stock; and that as a result of such fraud both the exchange and the purported stockholder ratification were void.[2] Recision or the difference in value between the price paid and the real worth of the IDS stock was demanded. Kirby, although named as a defendant in the state court suits, actually was not served with process therein.

As not unusual in this type of suit, settlement negotiations soon began and in July 1955 a settlement stipulation in the Zenn suits was drafted. Alleghany thereupon moved in the New York Supreme Court for approval of the settlement. A Referee was appointed by the court to inquire on the merits into the fairness and adequacy thereof. Under New York practice, notice of the terms of the proposed settlement was sent to all stockholders and hearings commencing in September 1955 were held before the Referee.

In February 1955 a suit had been brought in the federal court in New York by another group of stockholders entitled Breswick v. Briggs, S.D.N.Y., 135 F. Supp. 397. Although some of the charges made were similar to those in the Zenn suits, the 1950 IDS stock exchange was not placed in issue.

The Breswick plaintiffs had not been participants in the Zenn settlement negotiations. For this reason and lest they be bound by any settlement therein, they sought and obtained in October 1955 a federal court injunction against the interposition of any defense based upon any settlement agreement not negotiated with them.

Returning to the hearings before the Referee in the Zenn action, there was vigorous opposition to the settlement. Many of the arguments now advanced were urged as reasons for rejecting the settlement. Counsel (Seymour Graubard of Graubard & Moskovitz) for one objectant (Rosen) in particular worked in close association with counsel in Breswick. The statistics as to the nature and duration of the hearing are revealing. Eighteen witnesses were called, some 480 exhibits introduced, over 4,600 pages of testimony were taken and twenty-two law firms and attorneys appeared. The hearing on the merits of the settlement was, in effect, a hearing on the merits of the suits.

The primary issue in the first cause of action in the Zenn suits was whether Kirby knew or should have known that the IDS stock, which he obviously had acquired from Alleghany in a self-dealing transaction, was worth far more than he paid for it. Counsel for Alleghany, to establish such knowledge and a logical imputation thereof, sought to and did by pre-trial procedures delve into the files of Alleghany and IDS for proof.

The Referee characterized the hearings as "truly an adversary proceeding, more nearly resembling a trial on the merits than a hearing on a proposed settlement * * *" He accurately perceived the principal issue, namely, Alleghany's claim that the defendants had failed adequately to reveal to the stockholders "the alleged sharp upward turn in the profits of IDS and the further improvement of future earnings which it is claimed was foreseen by Young, Kirby and Purcell."

Before considering the facts which appellant claims were not before the Referee, the alleged concealment of which forms the basis of its argument that the settlement was tainted with fraud, it would be well to review briefly certain items of proof before the Referee which bore upon Kirby's then (December 1949 through May 1950) knowledge or which might reasonably have put him on notice of substantially increasing earnings.

In February 1950, Robert W. Purcell had written Young and Kirby advising them of a net income before home office expenses forecast for the IDS mortgage department alone of $5,720,000 for 1950 in contrast with $2,277,000 for 1949. Kirby was told that this estimate was

---

**2.** Similar charges were made in the "Second Count" of the consolidated amended complaint in the federal court Zenn suit, Civ. No. 92–205, S.D.N.Y.

said to be "very conservative" and that mortgage department "operations promise to show continued substantial earnings." Had Kirby inquired at the end of the first quarter of 1950 as to net income, he would have learned of an income figure of $639,040 instead of a corresponding 1949 first quarter loss of $1,298. Purcell's optimism for 1950 was justified by a net income for 1950 of $6,454,411 instead of $1,365,485 for 1949. In addition, the Referee had the actual net income figures for the years 1949–1953 as contained in the IDS annual reports which showed a steady increase from $374,355 in 1948 to $13,229,310 in 1953.

During the trial in the district court, Alleghany caused to be produced certain documents which were not before the Referee and claimed that Kirby's failure to adduce them on the settlement hearings prevented the Referee from properly evaluating the fairness and adequacy of the proposed settlement under consideration. Of the "non-disclosed" documents which Alleghany claims were of critical significance, it stresses the following:

A. *The Froggatt Report of April 29, 1949.*

This report was addressed to the IDS Board of Directors and was primarily concerned with a valuation of IDS certificates in force as of December 31, 1948. In addition, a prognostication was made for the years 1949–53 of net income available for improving certificate reserves before profit or loss on sale of investments or income taxes. Kirby apparently had received this report in August 1949. It was mentioned in an exhibit introduced before the Referee and was later found in Alleghany and IDS files.

B. *An IDS Projection of Net Income for the Years 1949–53 Before Profit or Loss From Sales of Investments and Income Taxes.*

There was no evidence that Kirby had received these figures.

C. *An IDS Projection of Net Income for 1950 Through 1954 and a Projection for 1950 by Months.*

These projections produced from the IDS files in discovery proceedings were not admitted in evidence by the district court because there was no evidence that Kirby had ever had them in his possession or that he knew of them. Nor was there any showing that counsel in Zenn had been in any way precluded either in pre-trial or in the settlement hearings from seeking any and all papers in the possession of IDS. To the contrary, there was proof that during the hearings before the Referee (1954–1958) documents in the IDS files were available upon request.

D. *The Purcell Letter to Young Dated July 27, 1954, With Enclosures.*

On July 27, 1954, Purcell sent to Young a letter from Waag, Vice-President and Controller of IDS, with certain documents obtained from Waag. The statement entitled "Comments on Operations December 1950" compares IDS' financial situation as of December 31, 1950 with the same date in 1949. 1950 income is stated as $6,142,232 in contrast to 1949 income of $1,078,272. However, this statement must have been prepared subsequent to December 31, 1950, and hence not available prior to the consummation of the exchange. The district court excluded this exhibit. Another statement disclosed net income for 1949 and 1950 by quarters. Although excluded by the district court, this statement had been introduced in the Zenn hearings and showed an increase in net income from $1,365,485 in 1949 to $6,454,411 in 1950. The third statement set forth a 1950 quarterly analysis of some of the larger housing project items in which IDS had participated. This statement, although not received below, had also been admitted in the Zenn hearings.

In summary, most of the allegedly "non-disclosed" documents came from Alleghany or IDS files. In some instances, copies were produced from Kirby's files. The fact that IDS prepared projections could not have been unknown to Alleghany counsel in Zenn because the April 7, 1949 Shipman report contained a ten-year (1947–1956) IDS earnings projec-

tion. Other documents did not come into existence or into Kirby's possession until after the stock exchange had been consummated. As to the documents which Kirby received, he was chargeable with all the legal consequences of such information; as to those excluded by the district court on the ground that there was no evidence that Kirby had seen them, there is no basis for holding this finding of fact to be clearly erroneous. Furthermore, the district court had in the record before him evidence virtually identical to that contained in the documents excluded by him, particularly with relation to compilations of projected earnings. The earnings projections would undoubtedly have been useful in cross-examining Kirby before the Referee as to the extent of his belief with respect to future earnings. However, Kirby was not called as a witness and, therefore, there was no occasion to cross-examine.

As a result of the federal court's suggestion in Breswick, the defendants in Breswick, including Kirby, engaged in their own settlement negotiations. These were productive of an increase in the Zenn offer, from $700,000 cash to $1,000,-000 plus certain other benefits. However, the Breswick plaintiffs still were not satisfied. The Breswick defendants then moved to vacate the injunction which for practical purposes was standing in the way of the Zenn settlement. The federal court thereupon appointed the Zenn Referee as a Special Master to hear and report on the good faith of the Breswick settlement proposal. Hearings were held in October and November 1956 and 675 pages of testimony were taken.

In June 1958 the Referee reopened the Zenn State court hearings to receive the increased offer and in November 1958 handed down his report of some 125 pages approving the settlement. Thereafter exceptions to the report were filed on behalf of the stockholder Rosen objecting to the settlement. The Referee's report was attacked as ignoring and glossing over the evidence that tended to establish liability. The court was urged to "scrutinize the evidence and examine the law" and then withhold approval of the settlement. In the brief opposing approval, the objectant presented virtually all the arguments now advanced by appellant, namely, (1) the possession of inside knowledge by Kirby and Young that the earnings of IDS would increase approximately 500% for 1950 alone; (2) the illegality of the meeting of December 6, 1949 authorizing the exchange offer; and (3) the failure to disclose material facts to the stockholders and the falsity of facts disclosed in the proxy statement for the meeting of May 3, 1950 at which the exchange was ratified. The law relating to self-dealing on the part of directors, their fiduciary position, the legal effect of inside knowledge, the invalidity of the defenses of ratification and laches because of fraud, was also placed before the court.

In support of these arguments, the objectant had facts, leads and clues from which to draw the conclusion that Kirby knew or should have known of the speculative potential in the IDS shares. From the outset in 1948 when Alleghany was considering the acquisition of the voting and Class A (non-voting) stock of IDS, Kirby, Young and their associates were aware of the IDS financial picture. Kirby desired to be kept fully informed. This desire was fulfilled by oral and written financial reports. Specifically, Kirby was advised (if he did not already know) by Purcell's letter to him and Young dated February 11, 1950, that there was enough additional mortgage business on the IDS books in 1949 to add some $5,-500,000 to IDS's 1950 earnings. The prophecies envisioned were soon realized. Even before the stock exchange was consummated in May, 1950, the first quarter earnings of $631,000 against a loss of $223,000 for the corresponding quarter of 1949 were available. And had any counsel desired to inquire of Kirby himself not only as to his then knowledge but as to his state of mind regarding IDS and its future, all legal processes were at their command to make such

inquiry. Even forecasts were known to have been made. Graubard in his testimony specifically mentioned forecasts and said that "my briefs to the Referee and Judge McGivern lay stress upon these forecasts." He had "a particular recollection indeed of mention of these forecasts in correspondence between Mr. Purcell and Mr. Young." Furthermore, Graubard argued in Zenn that the letter vividly demonstrated that "Purcell was able early in February 1950 to predict with uncanny accuracy the extra five million in mortgage department earnings of IDS for the entire year 1950."

The Supreme Court confirmed the Referee's report, saying in part that "Every proposed settlement in this type of litigation constitutes a compromise in which each of the parties expects to make some surrender, in order to prevent costly and protracted litigation," and concluded that "In sum, after consideration of all of the factors in this case, this court is of the opinion that the original stipulation of settlement herein, as now augmented by the latest subsequent offer of defendants, is fair and reasonable, was negotiated at arms' length, is free from fraud or collusion and is in the best interests of the Alleghany Corporation and its stockholders." Zenn v. Anzalone, 17 Misc.2d 897, 898, 899–900, 191 N.Y.S.2d 840, 843–844 (Sup.Ct.1954). However, because of the existence of the injunction in the Breswick suit in the federal court, the New York court directed that no order be entered until the injunction was vacated.

Thereafter, the federal court rejected the report of the Referee (Special Master in Breswick) which recommended that the injunction be vacated. At this stage further settlement negotiations were renewed which resulted in an offer by Kirby satisfactory to court and counsel in the Breswick suit. A supplemental stipulation of settlement in the Zenn action was thereupon executed, providing for the payment by Kirby of $1,100,000. The Young Estate agreed to contribute an additional $900,000 to the basic Zenn settlement. Thus, Alleghany received $3,000,000 cash and return of control of IDS to Alleghany by the Murchison Brothers. The federal court injunction was thereupon vacated and towards the end of December 1959 orders of the Supreme Court, New York County, were entered, approving the settlement.

Appellant in this action originally attacked the settlement upon two grounds: (1) that Kirby obtained a favorable settlement for himself in the negotiations of October, November and December 1959 by inducing the defendant Randolph Phillips to betray alleged fiduciary duties to Alleghany for personal benefits promised to him by Kirby, and (2) that Kirby had failed to adduce before the Referee and the state court facts material to a proper evaluation of Kirby's liability on claims arising out of the 1950 IDS stock exchange transaction.

The district court found that appellant had failed completely to establish any fraud in which Kirby and Phillips were involved in connection with the ultimate settlement. No appeal has been taken from this finding. There remains for consideration whether Kirby's alleged failure to produce certain records before the Referee in the state court Zenn action under the circumstances provides a basis for a federal court setting aside the settlement and, in effect, trying the case de novo on the merits despite the settlement.

The theory behind allowing a stockholder to bring a derivative stockholders' action rests upon the belief that wrongdoing directors will not voluntarily sue themselves or willingly admit their wrongful acts; hence, the right to bring a suit on behalf of the corporation is given to a stockholder. Here there were ten such suits. At this stage, if the defendant directors were fiduciaries, they certainly were not considered as such by the stockholder plaintiffs. They were under attack and entitled to defend themselves by all legal means including the right to require the plaintiffs to prove the charges made. They were, of course, under a duty to respond to all subpoenas, upon proper demand to produce all rec-

ords in their possession, and to testify if called as witnesses. In the Zenn suit Kirby, although named as a defendant had not been served. He had not been subpoenaed or served with a notice to produce records in the suit itself or in the proceeding before the Referee. Nor did he testify before the Referee. Control of Alleghany's interests so far as the 1950 IDS stock exchange was concerned was in the hands of competent counsel in the derivative suits on behalf of Alleghany who had available to them all the procedural processes designed for effective pre-trial preparation. Kirby and his co-defendants were in no position to force a settlement upon the Zenn plaintiffs. These plaintiffs could have insisted upon a trial. Had they prevailed, the damages according to the theory adopted by the court could have ranged from modest amounts to astronomical figures. But even fraud cases can often be settled. A settlement is the price of peace. There is no prerequisite to the settlement of a fraud case that the defendant must come forward and confess to all his wrongful acts in connection with the subject matter of the suit. Usually such settlements are accompanied by vigorous denials of any fraud whatsoever. Yet the entire thrust of appellant's argument on this point is, in effect, directed to a proposition that Kirby was under some affirmative duty to come forward voluntarily with facts and documents possibly disclosed for the first time in this suit and of which he may or may not have had knowledge.

There can be no question that the exchange transaction perpetrated by Kirby, Young and Purcell violated fundamental legal principles against self-dealing. If the purchase of IDS was thought to be advantageous for Alleghany over a period of years, there was no justifiable reason for these officers to take this advantage away from the corporation to which they owed fiduciary duties. Nor can there be any question that the proxy statement on the basis of which stockholder ratification was sought was misleading, both in its statements and par-

ticularly in its omissions. Thus, the illegality of the exchange, the deception practiced upon the stockholders, the falsity of the Kirby statement as to the date of the exercise of the exchange offer, knowledge, either actual or imputed, of the very substantial increase in IDS earnings, the actual history of the earnings and market price of IDS stock over the period from 1950 to 1955, all these facts were available to the Zenn plaintiffs and were the basis of the charges in the stockholders' complaint. To counsel who now represent Alleghany these are "shocking facts," but they probably were equally shocking to the counsel who then were responsible for Alleghany's welfare. Alleghany could have submitted these facts to the court for determination on the merits. Through its representatives, it elected to settle. The requirement that settlements of derivative suits be upon notice to all stockholders and be subject to court scrutiny and approval was a further protection. If the settlement were approved over stockholder objection, as here, such stockholder had a right to appeal to the Appellate Division of the Supreme Court and under certain circumstances to the New York Court of Appeals. The objecting stockholder here did not exercise such rights. Having failed to pursue its remedy along normal channels, Alleghany by this action sought to have a federal district court act, in effect, in an appellate capacity to review the decisions of the Referee and the New York Supreme Court. It does this upon its theory that it has discovered certain documents which, if produced before the Referee and Supreme Court would have induced them to have disapproved the settlement.

The wrongful conduct of Kirby and his associates formed the entire basis for the Zenn suits. The Referee and the counsel for the complaining stockholders were not kept in ignorance of the facts. If their searches, aided by pre-trial discovery, did not uncover certain documents, if their inquiries fall short of obtaining the documents now brought forth by Alleghany's present counsel, or if in

their judgment various documents were not introduced into evidence, these circumstances do not justify the setting aside of a settlement satisfactory to those in charge of the suit in behalf of Alleghany. Particularly is this true in the light of the bitter attack upon the settlement by the objecting stockholder. Were every settlement which had been carefully examined and judicially approved to be vacated at the behest of some subsequent corporate champion who brings forth certain documents which he claims might have so influenced the court that the settlement might not have been approved, there would be no finality to any litigation whether by settlement or by judgment.

■■ By *a fortiori* analogy, the evidence said to have been "non-disclosed" or concealed should at least be of the character required for a new trial, namely, would it "probably have produced a different result." Helene Curtis Inds. v. Sales Affiliates, 131 F.Supp. 119, 120, aff'd 233 F.2d 148 (2d Cir.), cert. denied, 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80 (1956). So much stronger should be the evidence of fraud where a collateral attack is being made in a federal court on a state court judgment which the parties thereto did not even challenge by resorting to state appellate proceedings. Examination of the "non-disclosed" documents leads to the conclusion, also reached by the district court, that although the documents would have been admissible had they been offered before the Referee, they do not form a basis for "collaterally attacking a judgment rendered after trial or a release given pursuant to the judgment." 218 F.Supp. at 186. At most they would have been but cumulative evidence upon the basic issue of Kirby's fraud in acquiring IDS stock at a grossly inadequate price. But this fraud gave rise to the stockholders' suit and for this fraud he paid the settlement price. It is this price with which Alleghany's present counsel is dissatisfied. However, as long as there are lawyers there will be expressions of honest belief that better settlements could have

been obtained had subsequent counsel been in charge initially.

Alleghany makes much of our decision in United States v. Consolidated Laundries Corp., 291 F.2d 563 (2d Cir.1961), as supporting its argument that it was not for the trial judge here to speculate concerning the effect which the "non-disclosed" documents might have had on the Referee or the Court which confirmed the report. The situation in Consolidated Laundries was quite different. Had the documents there been made available to counsel for the defense upon cross-examination, the testimony of the Government's principal witness might have been so discredited or altered that the very basis for the court's factual determinations might have been shaken and changed. Here, however, the "non-disclosed" documents merely supply additional evidence that Kirby knew or should have known that the value of the stock he was acquiring was substantially greater than the price paid. The documents would undoubtedly have given the plaintiffs in Zenn greater fire power to train upon the enemy but judging by the plaintiffs' and objectant's briefs a rather substantial barrage was laid down. Alleghany's real dissatisfaction must be based upon the Referee's and Supreme Court's decisions. There was certainly enough evidence presented to justify a rejection of the proposed settlement. Yet the stockholders suing on behalf of Alleghany, represented as they were by able counsel, chose settlement. Whatever our thoughts may be as to the merits of the derivative suits and the wisdom of the settlement, these issues are not before us.

Alleghany advances as a legal proposition that Kirby was under an affirmative duty to present facts which might aid his adversaries in establishing his liability. No authority is cited for this proposition which would require a defendant accused of fraud to make an investigation of the files of the companies involved and to tender voluntarily all relevant documents there discovered. Even then such a defendant would be in

peril of having the settlement vacated if in the future other letters or documents were discovered. No support for this legal theory comes from Alleghany's citation of cases establishing the duty of self-dealing directors to make full and frank disclosure. For this failure the Zenn and Breswick suits were brought. On the merits Kirby and Young may well have obtained substantial financial benefits for themselves by wrongful self-dealing. But the *bona fides* of the 1950 stock exchange were not the issue for determination by the district court here; the issue was whether there was a sufficient basis for a federal court to nullify a settlement in a case involving fraud which had been judicially approved in the state court.

Appellant cites Masterson v. Pergament, 203 F.2d 315 (6th Cir.), cert. denied, 346 U.S. 832, 74 S.Ct. 33, 98 L.Ed. 355 (1953); Cohen v. Young, 127 F.2d 721 (6th Cir.1942), cert. denied, 321 U.S. 778, 64 S.Ct. 619, 88 L.Ed. 1071 (1943); and Heddendorf v. Goldfine, 167 F.Supp. 915 (D.Mass.1958) as supporting the principle that settlements in derivative actions should be set aside if accomplished through concealment by wrong-doing directors. In Masterson, supra, the appeal was from an order of the district court approving a compromise in a derivative suit. The order was affirmed although the dissenting judge would have vacated the settlement and directed the trial to proceed on the merits. The majority noted the difference between a trial on the merits and a review of a settlement, saying, 203 F.2d at 330:

"We must not forget that what was submitted to the District Court was a proposed settlement. A settlement is the result of a compromise and in effecting a compromise each of the parties expects to make some surrender, in order to prevent unprofitable litigation, effect upon its credit, the wasting of time on the part of its officers that should be devoted to the success of its enterprise and, so, compromises are generally approved by the courts."

In Cohen, supra, the same dissenting judge wrote for the rejection of a settlement but on the ground that the district court was in error in not considering the available evidence and in relying merely upon the recommendation of a majority of the attorneys. The case was remanded so that further testimony could be taken.

In Heddendorf, supra, the issue before the district court was whether the settlement of a stockholders' derivative action should receive court approval. The court initially disapproved the settlement because of its failure to safeguard the stockholders against further wrong but left the door open for a settlement plan which contained protective provisions (167 F.Supp. at 923). In a supplemental opinion, approval was withheld until certain information was supplied under oath (id. at 926). Finally, the second compromise was approved (id. at 929). These steps were not unlike the proceedings in Zenn and Breswick whereby ultimately a settlement satisfactory to court and counsel in these cases was reached.

More analogous is the case of Feldman v. Pennroad Corp., 155 F.2d 773 (3d Cir.), cert. denied, 329 U.S. 808, 67 S.Ct. 621, 91 L.Ed. 690 (1946). There a settlement of a stockholders' suit in the Delaware state court was approved by the Court of Chancery after a hearing upon which many parties appeared in opposition. The Supreme Court of Delaware affirmed the Chancery Court's decision. During this proceeding, the plaintiff Feldman brought an action in the federal court to enjoin the consummation of the proposed settlement. The district court dismissed the complaint. On appeal, the court of appeals affirmed, saying: "In the absence of bad faith, the Delaware law affords her no right to judicial interference with the settlement merely because the amount agreed upon in settlement is deemed by her to be inadequate." (155 F.2d at 776.) The court referred to the state court's finding "after a full

hearing that the Pennroad directors acted in good faith in agreeing to the settlement," and held that the "determination of these basic facts by the Court of Chancery is, therefore, now conclusive between the plaintiff and Pennroad and she is estopped from further disputing them in the present case."

■ Tempting though it be to retry the settlement proceeding in the New York Supreme Court and, possibly with the subconscious advantages of hindsight, to reach different conclusions and draw different inferences from those of the Referee and court therein, this is not our appellate function. The district court had to resolve the issue before it, namely, whether to vacate the State court judgment approving the settlement because of Kirby's alleged failure to produce certain documents. Essential to such resolution were such fact findings as Kirby's possession and control of the documents, his knowledge of their contents and his suppression thereof. Upon the trial, the counsel representing Alleghany had full opportunity to examine and cross-examine the principal alleged culprit, Kirby, Pomerantz (counsel for the stockholders in the Zenn suits), Graubard (counsel who so vigorously opposed the settlement), Purcell, Shipman, the various attorneys who were instrumental in bringing it to a conclusion in December, 1959, and other witnesses. After hearing these witnesses, the court found "that plaintiff has failed to establish that defendant Kirby committed a fraud upon the State court or its Referee in failing to produce documents at the hearings before the Referee which were not called for at the hearings and most of which were not in his possession but were in the possession of IDS." 218 F.Supp. at 186. In the light of the concession by plaintiff's counsel that he could not tie the financial projections sought to be introduced to Kirby's personal knowledge, the district court's refusal to speculate or infer that Kirby must have seen them cannot be characterized as "clearly erroneous." In view of this factual finding, it is unnecessary to consider the district court's alter- native conclusion that plaintiff cannot collaterally attack the settlement in the State Court because "The conduct of Kirby, if fraudulent, was not extrinsic fraud as defined by New York law."

Affirmed.

KAUFMAN, Circuit Judge (concurring):

As my brother MOORE has amply demonstrated in his able opinion, the New York State judgment which we are here asked to overturn was rendered only after extensive hearings, exhaustive arguments of counsel, and protracted negotiations. Unlike the situation which prevailed at the time of the exchange transaction itself, moreover, the Zenn settlement proceedings did not involve a body of silent and quiescent shareholders, meekly trusting their directors to act in the best interests of the company. Rather, it is reasonable to infer from the nature of the controversy that at the time of the Zenn hearings the shareholder-plaintiffs and their experienced and zealous attorneys recognized Kirby and his co-defendants as bitter antagonists, whose interests in the settlement negotiations were diametrically opposed to those of Alleghany. Under these circumstances, therefore, while I find it unnecessary to determine whether the director-defendants were under any greater obligations than those customarily borne by an adverse party in a lawsuit, I agree with Judge MOORE that Alleghany has failed to establish that we should take the extraordinary step of setting aside a final and binding state judgment in a wholly collateral action.

In light of my brother FRIENDLY'S considered dissenting opinion, however, a few additional remarks would seem to be in order. Thus, although the case was argued—both in the District Court and on appeal—primarily if not exclusively on the theory that Kirby's failure to produce certain documents constituted fraud sufficient to vitiate the state judgment, the dissenting opinion appears to see the case in a somewhat different light. Conceding that personal dereliction on

Kirby's part was not established, it appears to suggest that this is irrelevant, and that the withholding of material documents from the eyes of the referee in Zenn justify setting aside the judgment, even if this nondisclosure was the work of Young and Purcell, and not that of Kirby. The underlying premise of this line of reasoning seems to be that Kirby ought not be permitted to claim the benefit of a favorable settlement if that settlement was procured by fraudulent means—even if he was not a party to the fraud.

This approach to the case—which focuses on the activities of Young and Purcell, rather than that of Kirby—has much to commend it at first blush. In terms of its reliability as a fair and genuine adjudication of the adequacy of the settlement, the referee's approval would seem to stand on no firmer grounds merely because the fraud which kept material documents from the attention of the Zenn plaintiffs may not be directly imputed to Kirby. But if I am thus willing to concede the validity of this sort of analysis as a general proposition, I am unable to agree that the conduct of Purcell and Young was such as to warrant overturning the judgment as against Kirby.

As I understand it, the crucial document which Purcell and Young are alleged to have withheld is Exhibit 365 for identification, a comparison of actual 1949 earnings, with actual and projected figures for 1950.[1] Since the actual figures were before the Zenn referee, the key item here is, of course, the projected outlook for 1950. And it is the failure of Purcell and Young to come forward with this projection which forms the basis of the claim of fraud.

But the majority opinion has quite properly noted that the particular pieces of paper which comprise Exhibit 365 could not have been seen by anyone at the time of the exchange transaction—let alone by Kirby. Since the document contains actual figures for 1950, it could not possibly have been compiled before May, 1950, when the exchange transaction was consummated. Further, as both majority and dissenting opinions observe, the essential information conveyed by Exhibit 365 *was* before the Zenn referee, and was spotlighted by the vigorous arguments of counsel. Thus, the spectacular improvement in the earnings of the IDS mortgage department, almost wholly responsible for the large increase in IDS total earnings, was predicted in Purcell's letter to Young and Kirby, which was, in turn, introduced in Zenn. Indeed, the primary difference between Exhibit 365, which which was, turns on the fact that the former also indicated that the substantial was not introduced, and the Purcell letter, gains in the mortgage operations would not be nullified by losses of other IDS divisions.

In short, the Zenn referee was informed of the projected vast increases in the earnings of the mortgage department; he was not told that the other IDS divisions were not expected to lose money. But even if his failure to learn of this last piece of information may be attributed to the nondisclosure of Purcell and Young, I cannot find this sufficient to warrant upsetting the New York judgment as against Kirby.

In so deciding, I agree with Judge MOORE that the relevant standard cannot be that provided by our decision in United States v. Consolidated Laundries Corp., 291 F.2d 563 (2d Cir. 1961), or whether there is any fair basis for thinking that the undisclosed documents "might have" changed the result. Consolidated Laundries, a criminal prosecution, involved the negligent failure of the government to produce information rele-

---

1. I do not take it as suggested that either Young or Purcell acted "fraudulently" in failing to produce the handwritten Purcell-Young note. Whatever the duty to be imposed on defendant-directors or their "confederates," I would hardly think that it encompasses production of this sort of informal memorandum. Since the note is prominently mentioned in the dissenting opinion, however, I would add that Purcell seemed to consider "not too helpful" the spread between *actual* 1949 earnings of $1,515,401, and *actual* 1950 earnings of $8,600,444, figures which *were* before the Zenn referee, rather than projected 1950 earnings of $5,992,168.

vant to the defense; our result was derived from our continuing duty to supervise the administration of criminal justice in the federal courts. Here, on the other hand, we are asked to set aside a state judgment in a civil action because of fraud which was allegedly committed by parties other than the present defendant. In such a situation, considerations of *res judicata* and comity must be taken into account; institutional imperatives and the necessity of finality in litigation are of far greater significance. In short, even if the obligations of a court passing on the settlement of a derivative suit may be analogized to those of a criminal court, my reply is that we are neither in the position of passing on the settlement or reviewing a criminal conviction. By its action in Zenn, the Supreme Court of New York passed on the settlement of this derivative suit; in the present proceeding, we are asked to set that judgment aside. Since we are hardly entrusted with the obligation of ensuring that the states do perfect justice in the civil litigation properly before them, we have absolutely no warrant in considering this settlement as if it were now being presented for our approval as an original matter.

I agree with my brother MOORE that Alleghany has failed to establish that the New York judgment should be set aside.

FRIENDLY, Circuit Judge (dissenting):

I can perceive no principle that would eliminate or even lessen the fiduciary obligations of directors who wish to settle a derivative action wherein they are charged with self-dealing. At least I cannot when, as here, they remain in control of the corporation, its officers, and its files relevant to the merits of the claim and consequently to the providence of the settlement. When they seek to extinguish the corporation's claim, they are dealing with the entity whose interests have been entrusted to them just as much as in the earlier transaction; I see no reason why their obligation of fair dealing and full disclosure to a court passing on the settlement should be a whit less than their previous duty to disinterested co-directors and to stockholders.

I agree nevertheless that a director thus sued is not bound actively to ferret out information that will promote the case against him or show the improvidence of a settlement to which he has persuaded a stockholder's lawyer to agree; and that insofar as the plaintiff's case here hinged upon establishing personal dereliction by Kirby with respect to the settlement hearings, this was not made out. But although the trial was largely conducted on one or the other of these theories, the complaint did not so limit the plaintiff, and on at least one occasion its counsel articulated another course which, in my view, it was entitled to pursue and which might well lead it to victory.

In examining Purcell and seeking to obtain admission of the evidence discussed below, counsel argued that "if Mr. Kirby entrusts the responsibility to some extent of his being a director of Alleghany, if he entrusts some of that responsibility to Mr. Young, then Mr. Kirby cannot avoid accepting the consequences of whatever Mr. Young may have done * * *." When one of a group of fiduciaries accused of illegal self-dealing conceals from a court facts which pertain to the liability of his associates as well as himself, a settlement so procured is voidable as to all. A partner for whose benefit the facts were concealed can no more preserve a settlement thus obtained than the one who was on the front line. If, as the evidence shows, Young, Kirby and Purcell conspired to make an unlawful appropriation of Alleghany's investment in IDS Class A stock, which was then challenged by suit, they remained bound to the end. Kirby recognized this rather pointedly when, late in 1959, he sent Young's widow a copy of counsel's letter advising him of his enormous potential individual and even more enormous potential joint liability, which Young shared, and implored that she "fully realize how important it is to you and me that there should not be the

slightest indication of disharmony in our ranks and that absolutely nothing should be done at this time to indicate anything like that." Kirby had hardly heard of Mr. Justice Brandeis' opinion in Jackson v. Smith, 254 U.S. 586, 41 S.Ct. 200, 65 L.Ed. 418 (1921), but his instinct was sound.

That the diversion of the IDS Class A shares from Alleghany's treasury was a joint enterprise of Young and Kirby, in which Purcell, like them a director of Alleghany, joined before its consummation—if indeed he had not been a party to it from its inception—will appear from what is said below. All three were named as defendants in the state court action, Zenn v. Anzalone, wherein stockholders sought damages or rescission; although Kirby had not been served in that action, he had been in a similar action by Zenn in the federal court. All three had an interest in promoting the settlement here attacked. Young and Purcell, but not Kirby, testified at the hearings before the Referee. There was evidence, here excluded, which showed, at minimum, that Young and Purcell permitted the Referee to pass upon the settlement when they should have been aware that crucial and damaging evidence, eagerly sought by an objector and well known to them, was not before him. If the settlement was voidable on that account against these members of the conspiracy, it is no less so against one who chose to remain secluded in Morristown, New Jersey, while his partners carried the heat of the battle in New York.

Plaintiff's discovery in this action found in Alleghany's files a handwritten letter by Purcell to Young on July 27, 1954, at a time when, as the letter shows,

Young was engaged in settlement discussions with Pomerantz, general counsel for the plaintiff stockholders in Zenn. Purcell, one of Alleghany's nominees on the board of IDS, had resigned as a director of Alleghany in March, 1953, to become president and later chairman of IDS, a post which he retained until the summer of 1955. With this Purcell sent a letter dated July 26, 1954, from Waag, Vice President and Controller of IDS, to him; Waag's letter enclosed three schedules. Purcell suggested that Young "note among other things on page 2 of the income account attached to the 'Comments on Operations' for December 1950 that Income from Operations, i. e., before taxes or capital transactions, *had been projected at $5,-992,168*, but turned out to be $8,600,444. *This may not be too helpful* as Income from Operations in 1949 was only $1,515,-401." (Emphasis supplied.) One of the schedules reproduced this forecast.

Indeed it would not have been "too helpful." The projected 1950 income before taxes or capital transactions amounted to $20 for each IDS share Young and Kirby acquired for $8.15 from Alleghany in the exchange transaction.[1] Yet their defense to the stockholders' claim hinged largely on a contention that the jump in IDS' earnings was not foreseeable when they acquired the shares in mid-May, 1950. Waag's letter stated the 1950 projection "was most likely completed in January of 1950 which would indicate that we anticipated a considerable improvement in our mortgage operations."[2] In his testimony in this case Purcell admitted having seen the full 1950 projections "early in the year" although not before his return from Europe

---

1. Apparently because of the nature of IDS' business, taxes took a much smaller bite than in the case of the usual corporation. Thus, in 1950, when pre-tax income amounted to $8,628,745, income taxes were only $2,592,000, leaving net income of $6,036,745—slightly over $20 per share.

2. Appellee argues that Waag erred as to the date, since the projection found in

the IDS files was dated April 14, 1950. The latter seems to be a somewhat differently organized projection in which the corresponding item for earnings before taxes and non-recurring transactions was $5,641,150, but the addition of earnings of subsidiaries produced a total of $7,-140,850. In any event the Alleghany's stockholders' meeting was not held until May 3 and the exchange was not consummated until May 15, 1950.

around April 12. In any event, Purcell's request to Crabb, President of IDS, on May 10, five days before the exchange took place, for additional copies of the IDS projections showed that at least by this date, copies were in his possession. Since during April Purcell was endeavoring to acquire for himself $125,000 worth of IDS Class A stock in connection with the simultaneous acquisition by Young and Kirby, the likelihood that he paid close attention to the projections as soon as they became available is overwhelming. Purcell's letter of February 11 to Young and Kirby informing them of the improved earnings projected for the mortgage department showed that Purcell was attentive to whatever predictions were available. Projections were of unusual importance at IDS during this period because of the company's heavy cash commitments to redeem maturing investment certificates in the next two or three years. As Kirby testified in this case, had the earnings been insufficient to finance their redemption, IDS could have encountered serious financial difficulty. On the other hand, as is invariably true of highly "leveraged" debt-heavy structures, once a sufficient flow of cash was assured to cover these commitments any further increases in operating profits, such as this projection foretold, would predictably cause a dramatic increase in net earnings. The IDS files also yielded a projection using the same figure for 1950 (with a handwritten notation that the estimate of underwriting income was "very conservative") and showing that for the years 1951–54 consolidated income before capital transactions and income taxes would range from $3,860,300 to $5,265,750. Since Purcell must have been in communication with Young during April and early May, 1950, as to being cut in on the exchange, it would be hard for a trier of the facts to resist the inference that he told the good news to his associate; no one so brilliant and experienced as Young would fail to recognize five years later what advantage would accrue to astute counsel armed

with Purcell's handwritten note and its enclosures.

What happened to Purcell's note and the enclosures cannot be precisely determined on this record. Two of the schedules attached to Waag's letter, a retrospective quarterly analysis of income for 1949 and 1950, and a list of the larger items included in commissions and participation project fees for 1950 by quarters, were offered in the Zenn settlement hearings by Pomerantz's colleague, Haudek, who was advocating the settlement; apparently he had obtained them by inspection of Alleghany's files. These were in no way damaging to the defendants or the proponents of the settlement since by their very nature they could not have come into existence until after the end of 1950 and the information they divulged could not have been known before that time; indeed, by showing that the greatest jumps in income were in the last three quarters and the most spectacular one in the fourth, they lent some support to the argument that the huge 1950 earnings were manna of whose prospective descent Kirby, Young and Purcell could hardly have been aware. But the seriously damaging schedule, containing the projection of 1950 income, which Waag's letter said had been prepared in January and surely was available by mid-April, did not find its way into evidence in Zenn.

Responsive to Judge Dawson's rulings that he would not admit the handwritten note and that he would admit Waag's letter and the schedules only on proof that these were in the Alleghany files at the time of the settlement hearings, plaintiff's counsel argued (1) that the discovery of the projection in Alleghany's files, where Haudek had earlier found the two schedules which had accompanied it, warranted the inference that the entire group of papers had been in Alleghany's possession at the time of the Zenn hearings, and (2) that the non-production of Purcell's note, Waag's letter and the damaging schedule either by Haudek or by Graubard, counsel opposing the settlement, warranted an inference that Al-

leghany had not included them in the files made available for inspection. The argument seems sound enough. As to the first branch, we have called attention in recent opinions dealing with the tardy discovery of documents to "the evidentiary principle that the subsequent existence of a fact supports the inference of its earlier existence, when the subsequent condition is one which ordinarily would not exist unless it had also existed at the earlier time," United States v. Consolidated Laundries Corp., 291 F.2d 563, 569 (1961); Kyle v. United States, 297 F.2d 507, 511 (1961); this, particularly when reinforced by the earlier finding of two of the schedules in the Alleghany files, was at least enough to transfer the burden of showing how the missing documents had since come into Alleghany's possession if they were not there in 1955. The only other likely possibility would seem to be that they had remained with Young, but that would not have helped since Graubard had asked for and supposedly received all such papers in Young's possession. The second branch of the argument was supported by Pomerantz's testimony that he had reviewed the available files "very closely," and that his "best recollection is that we were shown no statements which contained estimates in futuro," by Graubard's testimony that he could not recall ever having seen a projection for 1950 and that "The probabilities are that I did not see anything which would indicate that the earnings would be so many times the sale of the stock. If I had, I would have introduced it in evidence, had I known," and by the inherent improbability that a lawyer so able and diligent would have failed to appreciate the significance of the schedule, especially when this was flagged for him by Purcell's handwritten note and it would have filled the very gap in his proof of which he was acutely aware.

However, I find it unnecessary to decide whether we could properly upset Judge Dawson's ruling that plaintiff had not sufficiently discharged the burden of showing that at the time of the settlement hearings the portion of the Waag file not offered by Haudek was in the possession of Alleghany or Young and was withheld from the documents made available for inspection. For even that view leaves Young and Purcell knowing or chargeable with knowing that the Referee was deciding without the benefit of evidence which they knew to exist—a full official projection showing the enormous 1950 earnings reliably expected for IDS, which had been known to Purcell and almost certainly to Young before the consummation of the exchange, the importance of which Purcell had sharply brought to Young's attention before the settlement negotiations, and which they and their counsel, who were also acting for Alleghany, knew to be precisely what the attorneys for the stockholders—Pomerantz before the settlement and Graubard thereafter—had been searching for without result.

Preparatory to the taking of the depositions of Young and of Wallace, Alleghany's secretary, in December, 1954, Pomerantz had made a demand for the production of documents from Alleghany, including "(35) All forecasts or budgets concerning IDS and its subsidiaries, prepared by or for the use of Alleghany or IDS and their officers and directors, during the year 1949, the first six months of 1950 and the last six months of 1953," and Haudek made this demand still more general when the depositions were taken. The quest for projections was continued by Graubard at the hearing before the Referee. He said he wanted "anything bearing upon the earnings of I. D. S. and, therefore, the value of its stock, at the end of 1949, during the Fall of 1949, and the Spring of 1950." In examining Wallace, he repeated the request, made during the depositions, for "any kind of forecast, both as to the nature of earnings from mortgage operations, as well as any other aspects of the business of I. D. S." and was told "There are no such documents in Alleghany Corporation's files, unless we find those various reports we are looking for." Complaining "that the poor Alleghany files are emaciated, they have been deprived of nourishment with regard to this 1949, 1950 transaction," Graubard asked for Young's personal rec-

ords, which as he later stated, counsel for Young made available. Apparently sensing that something was missing, Graubard noted in examining Young that he had "had some difficulty in finding the files and reports of Alleghany Corporation in regard to I. D. S. affairs for the period in question, 1949–1950"; this led to a chorus of objections by Pomerantz and Young's counsel and a ruling by the Referee striking out the offending remark. Later Young assured Graubard that his policy was never to destroy or remove or countenance the destruction or removal of files because he "felt that the first consideration of management was to conduct itself so that it never had anything to destroy . . ." This lofty concept of an officer's responsibility scarcely comports with permitting the Referee to approve a settlement for a few hundred thousand dollars of a liability for self-dealing ranging into the many millions without the benefit of evidence, which Young knew to be not "too helpful," relating to a vital element in the case. Of course, Graubard knew IDS had made projections; the point is that he had been given reason to think the record before the Referee contained everything Young and Purcell knew in the spring of 1950, whereas they knew it did not. As proponents of a transaction whereby they would purchase from Alleghany its cause of action against them, Young and Purcell had a duty to see that the Referee had that evidence; court approval of an advantageous bargain granted in ignorance of documents, known to Young and Purcell, showing that they had this optimistic projection in early 1950, no more finally settles the liability of themselves and Kirby than did the stockholders' approval of the underlying bargain in 1950, similarly procured without disclosure of the projection. Cf. ALI, Restatement of Torts 2d (Tent.Draft No. 10), § 551(2) (a).

Since in such complicated litigation some relevant documents will inevitably be overlooked, the undesirability of re-opening judgments demands that judicial approval be final unless the undisclosed evidence is of real importance and not merely cumulative of other evidence that was received. Kirby argues, and my brothers seem to agree, that the whole matter of the complete IDS projection of 1950 earnings is a tempest in a teapot because the record before the Referee did contain a partial projection of which Young and Kirby admitted knowledge. This was in a letter to them dated February 11, 1950, in which Purcell, before leaving for a vacation in Europe, gave "a brief report on the present situation in Investors Diversified Services, Inc. and the accomplishments of the nine months since our acquisition." The letter included a statement that reported 1949 income would reflect a large accounting adjustment to cure a deficiency in the certificate reserve account accumulated in prior years—one of the serious problems confronting IDS so featured before the Referee—and that "During 1950 the Mortgage Department forecasts, conservatively, $8,315,000 gross income from mortgage operations (not including interest), with a net, before home office expenses, of $5,720,000." Kirby then points out that Graubard, in his memorandum opposing confirmation of the Referee's report by Mr. Justice McGivern, argued that Purcell's letter "completely explodes the tortured analysis by which the Referee convinced himself that, although defendants had reason for cautious optimism, they did not foresee the 'spectacular' IDS earnings for the year 1950."

Graubard surely did the best he could with what he had, and one may indeed wonder whether anything short of proof that Young and Kirby had received a gold plated guarantee of IDS' 1950 earnings would have swayed the Referee, who went out of his way to compliment them on their presentation to the Alleghany stockholders, as to which more below, and concluded that a trial court would give judgment in their favor.[3] But there was an enormous difference between a paragraph

---

3. It should be remembered that the Referee approved a settlement under which

the total cash payment to Alleghany was $1,000,000, $300,000 of which had been

in a general letter, commenting on the prospects of one department of IDS, a paragraph not even noted in the Referee's report, and proof that shortly before making the settlement, Young and Purcell had been reminded of the existence of an official company forecast in early 1950, covering all departments, which negated any fear that the anticipated quadrupling of income from mortgage operations would be cancelled out and showed instead that this would be enhanced by other divisions.[4] There was at least a much greater chance that such evidence, developed as Graubard would have developed it, might have made some impression upon the Referee (who, because of the federal court litigations, did not file his report, dealing with a variety of claims of malfeasance, for three years after the hearings), or, if it did not, upon the Supreme Court justice who had appointed him, or, if it did not, that such

added to the proposal that Pomerantz had accepted as a result of the efforts of counsel for plaintiffs in the federal court action, Breswick v. Briggs. Although the state court accepted the Referee's report, Judge Dimock rejected it for failure by the Referee to hear the Breswick plaintiffs "on the question of the settlement value of the whole case and its relation to the value of the additional offers," and directed further hearings. Kirby, who had not previously testified in any of the proceedings, was scheduled to be the first witness at the reopened hearings; an associate testified that Kirby "looked upon his appearance as a witness with somewhat—with more or less horror, because he had been told by Ireland that Mr. Young had perjured himself in his testimony * * *." After receiving an opinion from counsel that his potential personal liability on the IDS exchange transaction approximated $22,800,000 and his potential joint liability an additional $39,-350,000, computed on a price of $1,600 per share for the stock acquired for $8.-15, plus over $70,000,000 for other items, he added to the settlement another $1,-100,000, which he estimated would cost him only $99,000 after taxes; Young's estate contributed another $900,000. One of the objectors having died and the others being tired out, this was accepted without the further hearing ever being held.

evidence might have encouraged the objectors to go on to the Appellate Division, or that it might have led Judge Dimock to refuse to lift the federal court injunction that had blocked the settlement.

I cannot agree that when judicial approval of a settlement by a fiduciary has been procured by culpable nondisclosure of evidence by a confederate, the test of materiality applicable on motions for a new trial on the ground of newly discovered evidence has any relevance; indeed, in the very decision cited by the majority, Judge Kaufman carefully distinguished between newly discovered evidence *simpliciter* and the recantation of a witness, 131 F.Supp. at 120. The test should be more nearly that applied by us in United States v. Consolidated Laundries, supra, 291 F.2d 563,[5] or by the New York courts in Matter of Lautz, 128 Misc. 710, 220 N.Y.S. 782 (Surr.Ct.,

4. The directors' answering memorandum before Mr. Justice McGivern minimized the Purcell letter of February 11 as merely reporting "favorable trends in certain aspects of IDS activity" and touching "only a few of the multitude of problems and activities of the Company."

5. Although the decision in Consolidated Laundries was based upon our duty to insure the fair administration of criminal justice in the federal courts, there are enough similarities between a prosecution and a derivative suit against self-dealing fiduciaries to make the test of materiality in that decision highly pertinent. Both the prosecutor and the director-defendant are charged with the duty of assuring that their adversaries are honestly and fairly treated. Just as a criminal court is entrusted with the protection of defendants from overzealous prosecution, a court passing on the settlement of a derivative action is charged with the protection of the absent shareholders, whose interests may be represented inadequately or not at all by the time a settlement has been negotiated. Where deliberate dereliction on a director's part has prevented the court from safeguarding the interests entrusted to it, a reasonable possibility that the undisclosed evidence might have led to disapproval or to a substantial increase in a settlement should suffice for reopening.

Erie Co. 1927); and Boston & Maine R. R. v. Delaware & Hudson Co., 238 App. Div. 191, 196, 264 N.Y.S. 470, 477 (3d Dept.1933)—whether there is any fair basis for thinking the undisclosed evidence *might have changed* the result. Here the evidence could well have done that.

I say this because, with full appreciation of the dangers of reliance on hindsight, Graubard's objections were so strong that almost anything more might have sufficed to tip the scales. Although my brothers seem to concede the inequity of the exchange transaction, this scarcely conveys the picture. Alleghany had decided to go into IDS in the spring of 1949, after a most thorough investigation. It picked up 48,225.61 shares of the non-voting Class A stock on the market for $8.15 per share; at the same time it bought some 17,745 shares of the voting stock for around $11. The control block of 85,660 shares of voting common was bought for $20. These prices were paid after a year, 1948, in which IDS had earned $374,355 or little over $1.25 per share. As 1949 wore on, Young and Kirby could not help but realize that Alleghany had made a fine investment, even though they could hardly have foreseen just how fine. By mid-August one of the consultants who had initially surveyed IDS for Alleghany accurately predicted IDS' 1949 income would amount to some $1,200,000 to $1,500,000, or more than $5 per share.

This was the background when seven of Alleghany's ten directors—including four officers, Kirby, Young, Purcell and Anzalone—assembled for a scheduled meeting on December 6, 1949. The agenda had not mentioned that any action with respect to the IDS stock in Alleghany's portfolio was contemplated.[6] The minutes recited that the Chairman, Young, "stated that among the securities which had been considered as available to be offered to stockholders in exchange for the Corporation's outstanding preferred stocks was the company's holding of 48,225.61 shares of Investors

Diversified Services, Inc. Class A Common Stock" but that counsel had advised that no offer of these shares to all stockholders "could be made without registration with the Securities & Exchange Commission which, in view of the size of the holding and the costs and delays incident to registration, would not be worthwhile." He therefore recommended, in addition to an exchange offer not involving the IDS shares which was being made to all preferred stockholders, a further offer which would give "the officers" of Alleghany the right to exchange holdings of Alleghany preferred stock for the holdings of IDS Class A. His recommendation was that the exchange ratio should "be not less favorable to the Corporation in relation to the respective market prices of the Alleghany Preferred stocks received and the Investors Diversified Services, Inc., stock delivered than the exchange ratios which are accepted by the company pursuant to the public offer." Discussion developed some concern over the fact that the current "market" price of the IDS Class A shares had dropped to $5.50 per share—in fact there was no market, as the Referee found; the directors, watchful for Alleghany's interests to the extent of thinking it might indeed seem peculiar to allow officers to acquire the IDS shares for an amount approximating current earnings, thought Alleghany should at least recover its cost. The resolution accepted Young's recommendation with the sole change that Alleghany was to get the higher of its cost or the market price of the IDS shares at the time of exchange.

Although it is understandable why registration problems made it impracticable to offer the IDS Class A shares, representing a relatively small investment, to all stockholders of Alleghany, that in no way explains why they had to be offered to anyone. Alleghany had scarcely acquired them after prolonged study, that very year, just in order to have something "available" to exchange for its own preferred stock at the better of cost or the

---

6. The absentees included two lawyers and an investment banker.

price on a market that was so thin as to be meaningless; its portfolio contained many securities, having a readily ascertainable market value which could be and were used to that end. The company's program of reacquisition of preferred stock had indeed been advantageous to the common stockholders and to preferred stockholders who did not exchange, but there was no crisis demanding that it immediately reacquire 2420 shares of Preferred Series A from Kirby, the same amount from Young, and 10 shares from Anzalone. The non-voting character of these IDS shares was no obstacle to their retention when Alleghany held 90% voting control. It must have been apparent that these shares were peculiarly unsuitable for an exchange offer to preferred stockholders, particularly to insiders. If IDS had the bright prospects that had led Alleghany to make its investment, all the stockholders should benefit; on the other hand, if the problems confronting IDS were as serious as Young and Purcell were later to testify, it was scarcely right that the officers of Alleghany, including such an inconspicuous one as Anzalone, should bear a disproportionate share of the burden. Evidently some such considerations occurred to the draftsman of the resolution, who inserted another reason for the offer, namely, that "it would give the officers who accept the Class A stock of Investors a further incentive to make successful the operations of that company in which Alleghany will continue to hold its large controlling interest." One might suppose that Young's holdings of 10,083 shares of Alleghany Preferred Series A and Kirby's of 27,858 such shares plus 516,500 common shares would have given a fair degree of incentive, and if Kirby or Anzalone made any contribution to the success of IDS in the years after the exchange, this does not seem to have been called to the attention of the many tribunals that have been concerned. The Alleghany officer who was truly active in IDS was Purcell, who had brought it to Alleghany's attention, kept a careful watch over it from the outset, and later became its president and moved his office to its headquarters in Minneapolis. Since Purcell owned no Alleghany preferred, his reward was to come in a different manner. On January 30, 1950, Alleghany authorized him to buy $125,000 worth of IDS common stock for his own account at not to exceed $10 per share, and guaranteed him against loss on such purchases. By the date of the Alleghany proxy statement, April 6, 1950, he had picked up 3,828 Class A shares at an average cost of $5.562. Since these purchases had driven the price of IDS Class A from 5 nearly to 10, Alleghany, on April 26, 1950, a week before the stockholders' meeting, sent out additional proxy material announcing that if Purcell was unable to complete this program for personal participation in Alleghany's corporate opportunity, Kirby and Young would supply him with the necessary IDS shares, at cost, out of those coming to them under the exchange offer. On May 9, Purcell wrote Young and Kirby, noting that if he "were now to enter the market the price of the stock would probably be driven very high," a result which "I believe we all agree * * * is undesirable"; he wished to purchase 6,366 shares from each of them at $8.1453 per share, as he subsequently did.

Although at the very least the situation demanded maximum endeavor to insure that Alleghany's stockholders understood exactly what was afoot,[7] the effort was unsuccessful. The Alleghany proxy statement, which sought approval of the exchange, gave no financial information about IDS as a company. With respect to the IDS stock it told that the shares to be offered the officers had cost $8.1453 per share, had a market price of $5.50 at the time of the resolution of December 6, 1949, and had a current market price of $9 bid, $9.75 asked, whereas the voting

---

7. In addition to the fact that the exchange was extremely advantageous to the officers on facts admittedly known, it is exceedingly doubtful whether the resolution passed by the directors had any legal status under the quorum requirements in Alleghany's certificate of incorporation; hence only action by the stockholders could give the exchange even formal validity.

common had been acquired at an average cost of $18.25 per share. Another portion of the proxy statement revealed the arrangement with Purcell and what he had done under it. On this basis, to the uninformed and unalerted stockholders, an exchange of IDS Class A shares that would give Alleghany the higher of cost or market would seem not unattractive, and the whole matter, involving an investment of $400,000, could hardly have appeared momentous. Only the stockholder who might wonder about the unusual disparity in cost between the voting and the non-voting stock would see cause for inquiry. For further information about IDS he would have to turn to Alleghany's Annual Report, mailed to him a fortnight before. If this had escaped the treatment usually given such reports, he would not have learned much. Although he was told that IDS' 1949 net income was "approximately $1,631,000, compared with $374,335 for 1948," no attempt was made to translate these totals into per share figures. A stockholder wishing to determine that would either have had to go to a financial manual to learn IDS' capital structure, or, if he returned to the Alleghany proxy statement, arrive at this figure by converting Alleghany's holdings into the total by first dividing the shares of each class which Alleghany owned by the percentage of its ownership and then adding the quotients—this to be followed by dividing the earnings by the sum so obtained. Granted that this computation is well within the power of the ordinary human mind, one may wonder how many Alleghany stockholders bothered to perform it. How simple it would have been for Alleghany's management to relieve the stockholders of this necessity by saying that IDS' 1949 earnings of $1,631,000 were more than $5 per share! And what illumination this would have shed on the succeeding comment that Alleghany regarded its interest in IDS "as a long-term investment," as to which, because of IDS' cash requirements, it did not "expect any return on our investment in IDS for a number of years" but considered the

"outlook for eventual profits * * * to be unusually promising." The eventual might have seemed to Alleghany stockholders to be now, at least with respect to the stock acquired at $8.15 per share which the proxy statement, but not the annual report, told them would be exchanged with insiders. And that impression would have been considerably accentuated if Alleghany's management had vouchsafed the information, available when the additional proxy material was sent out on April 26, that although IDS had lost $223,000 in the first quarter of 1949, its pretax income from recurring operations in the first quarter of 1950 exceeded $1,000,000 and that continuation of that trend would produce 1950 earnings exceeding $15 per share! If all this had been supplemented by proof to the Referee that at the time of the exchange Purcell and Young knew IDS was forecasting even higher earnings, could any rational mind have predicted that a court would decide for the defendants?

My brothers rightly shrink from a precedent that would make every settlement of a stockholder's suit the prelude to another in which the proceedings for approval of the settlement would be reexamined at great expense and effort. I too would regret that although, for reasons sketched below, it might be better if more such suits were tried and fewer settled so long as the procedures with respect to the approval of settlements remain as unsatisfactory as they are. But we would make no such precedent by a reversal in this case. Here we have an unusual situation. After litigation had begun, two of the principal architects and beneficiaries of the self-dealing and the subsequent settlement had their attention dramatically called to the existence of a report, clearly known to one of them and arguably to the other before the exchange, and nevertheless allowed the Referee to proceed to approval, knowing, on the most innocent construction, that this report, although eagerly sought by the objector's counsel, had not been found by him. Such cases will hopefully be rare; the instances in

which the corporation or a large stockholder will seek to prosecute them will be rarer still; and the chances of success and consequent reward will not be such as to tempt the typical stockholder plaintiff save in occasional cases where it is as well to have him tempted.

I cannot at all agree with the implication in my brother MOORE's opinion that standard procedures for the approval of settlements afford sufficient safeguards in the "big" case, or that they did in this one. The plaintiff stockholders or, more realistically, their attorneys have every incentive to accept a settlement that runs into high six figures or more regardless of how strong the claims for much larger amounts may be. The percentage allowance in stockholders' actions is "reduced as the amount of recovery passes the million dollar mark," 2 Hornstein, Corporation Law and Practice 253 (1959), see also Hornstein, Legal Therapeutics: The "Salvage" Factor in Counsel Fee Awards, 69 Harv. L.Rev. 658, 657-68 (1956); the income tax also plays a role; and a juicy bird in the hand is worth more than the vision of a much larger one in the bush, attainable only after years of effort not currently compensated and possibly a mirage. Once a settlement is agreed, the attorneys for the plaintiff stockholders link arms with their former adversaries to defend the joint handiwork—as is vividly shown here where the stockholders' general counsel sometimes opposed Graubard's efforts to gain information, although the settlement so vigorously defended before the Referee would have produced less than a quarter as much cash for Alleghany, $700,000, as the $3,000,000 ultimately secured through the efforts of the attorneys for the plaintiffs in the federal court litigation, unrelated to the claim here at issue, and Judge Dimock's initial refusal to lift the federal injunction. To say that "Through its representatives, it [Alleghany] elected to settle" is sheer fiction. Most of the independent Alleghany stockholders had no voice in the selection of their "representatives" or ability to evaluate the settle-

ment these "representatives" had accepted for them. I cannot see how the attorneys proposing the settlement were any more "representative" than the attorney opposing it; the stockholders' true representative was the court, which was allowed to proceed in ignorance of vital information. Alleghany as a corporation never elected to do anything until the very end of 1959, when a directors' meeting presided over by Kirby approved the settlement. Indeed, the directors did not even provide Alleghany with independent counsel, whose supervision of the file search might have avoided the problem here presented.

This very fact, that directors accused of malfeasance have so much control over the evidence, both documentary and nondocumentary, relating to their misdeed, makes it vital for a court of equity to insist upon a high standard with respect to disclosure at settlement hearings and to subject arguments that a breach was not consequential to a most icy scrutiny. All the dynamics conduce to judicial approval of such settlements. Even when there is objection, the changes are rung on the small proportion of the stock owned by the objector whereas a curtain falls on the equally small percentage owned by the plaintiffs, who quietly annex the stock controlled by the directors and that of the inert mass. Perhaps the ultimate solution may be the appointment of government inspectors to investigate and prosecute, as is authorized in England under the Companies Act, 1948, 11 & 12 George 6, c. 38, §§ 164, 165(b) (ii), 168, 169(4), see Gower, Some Contrasts between British and American Corporation Law, 69 Harv.L.Rev. 1369, 1387-88 (1956), or, in the case of corporations trading in whose securities is subject to the Securities and Exchange Act, assignment to the SEC of an advisory role similar to that conferred by Chapter X of the Bankruptcy Act, §§ 172, 173, 222, 247. In the meanwhile, courts should enforce the most exacting standards of good faith on fiduciaries desiring to settle such serious claims of self-dealing as were here alleged. Appellant is right in re-

minding us of Judge Cardozo's great words, "Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions." Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 62 A.L.R. 1 (1928). I do not believe this teaching is dead in the New York courts; and we have not hitherto demanded a state decision directly in point before enforcing that salutary principle. See Perlman v. Feldmann, 219 F. 2d 173, 50 A.L.R.2d 1134 (2 Cir.), cert. denied, 349 U.S. 952, 75 S.Ct. 880, 99 L. Ed. 1277 (1955).

I would therefore reverse the judgment dismissing the complaint and, as defendants should have an opportunity to meet the evidence that was erroneously excluded, remand for further hearing. Since Kirby has regained control of Alleghany, I would instruct the judge to make provision for the continued prosecution of the action free from any control by the present directors.